## MOORES *v.* CITIZENS' NATIONAL BANK OF PIQUA.

### IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

Argued March 6th, 7th, 1884.—Decided March 31st, 1884.

*Certificate of Stock—Corporation—Fraud.*

A lent money to B for his own use, and, as security for its repayment, and on his false representation that he owned, and had transferred to A, a certificate of stock to an equal amount in a national bank of which B was cashier, received from him such a certificate, written by him in one of the printed forms which the president had signed and left with him to be used if needed in the president's absence, and certifying that A was the owner of that amount of stock "transferable only on the books of the bank on the surrender of this certificate," as was in fact provided by its by-laws. B did not surrender any certificate to the bank, or make any transfer to A upon its books; never repaid the money lent, and was insolvent. The bank never ratified, or received any benefit from, the transaction. *Held,* That A could not maintain an action against the bank to recover the value of the certificate. *Held, also,* That the action could not be supported by evidence that in one or two other instances stock was issued by B without any certificate having been surrendered; and that shares, once owned by B, and which there was evidence to show had been pledged by him to other persons before the issue of the certificate to A, were afterwards transferred to the president, with the approval of the directors, to secure a debt due from B to the bank, without further evidence that such issue of stock by B was known or recognized by the other officers of the bank.

This is an action against a national bank to recover the value of a certificate of stock therein, which the bank had refused to recognize as·valid.

The amended petition and other pleadings are stated in the report of the case at a former stage, at which this court, for an erroneous ruling of the Circuit Court on a question of the statute of limitations, reversed a judgment for the defendant, and ordered a new trial. 104 U. S. 625. A recital of the pleadings is unnecessary to the understanding of the case as now presented.

The undisputed facts, as appearing by the admissions in the petition, by the evidence introduced by the plaintiff before the jury at the new trial, and by the defendant's admissions at that trial, were as follows:

The defendant was organized in 1864, under the act of Congress of June 3d, 1864, ch. 106, the twelfth section of which provides that the capital stock shall be "transferable on the books of the association in such manner as may be prescribed by the by-laws or articles of association." 13 Stat. 99, 102. The defendant's by-laws relating to transfers of the stock were as follows:

"SECT. 15. The stock of this bank shall be assignable only on the books of the bank, subject to the restrictions and provisions of the act, and a transfer book shall be kept in which all assignments and transfers of stock shall be made. No transfer of the stock of this association shall be made, without the consent of the board of directors, by any stockholder who shall be liable to the association, either as principal debtor or otherwise ; and certificates of stock shall contain upon them notice of this provision. Transfers of stock shall not be suspended preparatory to a declaration of dividends ; and, except in cases of agreement to the contrary expressed in the assignment, dividends shall be paid to the stockholder in whose name the stock shall stand on the day on which the dividends are declared.

"SECT. 16. Certificates of stock signed by the president and cashier may be issued to stockholders, and the certificate shall state upon the face thereof that the stock is transferable only upon the books of the bank ; and when stock is transferred, the certificates thereof shall be returned to the bank and cancelled, and new certificates issued."

The defendant's capital stock was one thousand shares of one hundred dollars each, the whole of which was in fact, and was alleged in the petition to have been, taken and paid for, and certificates therefor issued to the stockholders, at the time of its organization in 1864. The president and cashier of the bank were charged with the keeping of its transfer books and the issuing of certificates of stock, and the books of the bank were always open to the inspection of the directors. On July 15th, 1867, G. Volney Dorsey was president and Robert B. Moores was cashier of the bank, and said Moores, who had previously owned two hundred and seventy-five shares of the

stock, appeared on the books of the bank to be still the owner thereof. He and John B. C. Moores, the plaintiff's husband, were sons of William B. Moores.

On that day, the plaintiff agreed to lend $9,100 of her own money to Robert and William for use in their private business; they agreed to give her, as security for its repayment, a certificate of ninety-one shares, which Robert represented to her that he owned, and also the contract of guaranty hereinafter set forth; and Robert sent to the plaintiff's husband, as her agent, the following letter and certificate:

"Citizens' National Bank of Piqua,
"Piqua, O., July 15th, 1867.

"John: Herewith I hand you the stock transferred to Carrie. I don't know what day I will be down, and you can keep the contract there, and I will sign it the first time I am down. I will have to take a receipt for the stock from father, to file with my papers, to show where the stock is gone to. All well; may be down any day.

Y'rs,                    R. B. MOORES."

"THE CITIZENS' NATIONAL BANK OF PIQUA,

No. 56.              STATE OF OHIO.              91 Shares.

"This is to certify that Mrs. Carrie A. Moores is entitled to ninety-one shares of one hundred dollars each of the capital stock of the Citizens' National Bank of Piqua, transferable only on the books of the bank, in person or by attorney, on the surrender of this certificate.

"Piqua, O., July 15th, 1867.                    [Seal.]
"Rob't B. Moores,              G. Volney Dorsey,
          "Cashier.                    President."

This certificate was in the usual form of printed certificates used by the bank, and bore the genuine seal of the corporation, and the genuine signatures of the president and cashier; and the whole certificate, except the printed part and the president's signature, was in the cashier's handwriting, filled up by him in one of two or three blanks signed by the president and left with him to be used if needed in the president's absence.

Upon receiving the letter and certificate, the plaintiff paid the money to Robert B. Moores; and on July 18th he and William signed and sent to her the following contract:

"For value received, namely, the sum of ninety-one hundred dollars, Robert B. Moores has assigned and transferred to Caroline A. Moores ninety-one shares of stock of the Citizens' National Bank of Piqua, Ohio.

"Now it is agreed that the said Caroline A. Moores shall, upon demand by Robert B. Moores, or his assigns, reassign to said R. B. Moores the said stock for the same amount. And it is also agreed that, whenever the said Caroline A. Moores shall require it, the said Robert B. Moores shall purchase said stock at the amount aforesaid, and pay the same to her in cash. And in the meantime it is agreed, and the said Robert B. Moores and William B. Moores do hereby guarantee and assure to said Caroline A. Moores an annual dividend upon said stock of not less than ten per cent. upon the par value of said stock, namely, ninety-one hundred dollars, which guaranty shall be performed and fulfilled at the end of each year herefrom, or at the time of each dividend declared, if such dividend shall be declared oftener than once a year, and all deficiencies in said dividends shall be made good at the time of such repurchase or transfer to R. B. Moores.

"In witness whereof the said Caroline A. Moores and J. B. C. Moores, her husband, and Robert B. Moores and William B. Moores, hereunto set their hands on this 15th day of July, 1867.

"CAROLINE A. MOORES.
"J. B. C. MOORES.
"ROBT. B. MOORES.
"W. B. MOORES."

Robert B. Moores surrendered no certificate to the bank, and made no transfer to the plaintiff on its books. The plaintiff had no other knowledge of the rule requiring the surrender of an old certificate of stock before the issue of a new one, or of any fraud on the part of Robert, than was obtained by her reading and possession of the certificate. The value of the stock of the bank at that time was ninety per cent. of its par value. Robert B. Moores was insolvent, and the money lent to him by the plaintiff was never repaid.

The plaintiff put in evidence two letters to her husband from Dorsey, the president of the bank; one dated June 25th, 1872, stating that the writer had just learned that he held a certificate of stock purporting to be issued by the bank, and asking for its number, date and amount; and the other dated July 5th, 1872, the body of which was as follows:

"There is no such certificate as mentioned in yours of June 27th on our books. No. 56 is marked on the stub in our certificate book 'destroyed' in R. B. Moores' handwriting. Your wife's name was never entered among our stockholders and the certificate is a fraud. We never heard of this certificate until you mentioned it to Dr. Parker, who first informed me of it."

Robert B. Moores and Dorsey, being called as witnesses for the defendant, testified that it had no interest in the transaction of July 15th, 1867. Moores testified that at that date he had pledged to Jason Evans and other persons all the stock he had previously owned, and did not own any stock; and that he issued the certificate to the plaintiff without any authority from the bank, or any knowledge of the other officers. Dorsey testified that he had no knowledge of the issue of the certificate until June 25th, 1872, and that the bank never paid any dividends upon it; and he produced the certificate book of the bank, which showed the stub of a certificate, in its regular order, corresponding in number with that produced by the plaintiff, and having the word "destroyed" upon it, in the handwriting of Robert B. Moores.

The plaintiff offered in evidence, and the court declined to admit, the record of a meeting of the board of directors of the bank, on August 9th, 1869, containing the following entry:

"On motion, the following resolution was adopted and ordered to be placed upon the minutes: Whereas Robt. B. Moores, who was the owner of 275 shares of the capital stock of this bank (evidenced by certificate No. forty-seven (47) for fifty shares, dated May 2d, 1867; certificate No. forty-eight (48) for fifty shares, dated May 2d, 1867; certificate No. forty-nine (49) for sixty-five shares, dated May 2d, 1867; certificate No. fifty-three (53) for

seventy shares, dated June 11th, 1867, and certificate No. fifty-four (54) for forty shares, dated June 11th, 1867), became indebted to this bank in the sum of thirty-seven thousand two hundred and forty-seven 29-100 dollars, ($37,247.29), and did, on the 16th day of January, 1868, transfer one hundred and eighty-five shares of said stock, and on the 15th day of May, 1869, did transfer ten shares of said stock, on the books of this bank, to G. Volney Dorsey, in consideration that said G. Volney Dorsey pay to this bank the sum of nineteen thousand five hundred dollars of said indebtedness ; and whereas Jason Evans, who became the holder of seventy shares of said stock, issued as aforesaid and transferred to him by the said R. B. Moores on the books of this bank September 4th, 1867, as per certificate No. 59, did, on the 20th day of February, 1869, transfer to G. Volney Dorsey, on the books of this bank, by his power of attorney, all his right, title and interest in the same; therefore said transfers, as hereinbefore stated, are approved and affirmed by the directors of this bank."

The plaintiff also offered evidence that there were one or two other instances in which stock was issued by the cashier without any certificate being surrendered. But, as she offered no evidence, other than the directors' record of August 9th, 1869, that the other officers of the bank had any knowledge at the time of such transactions, or subsequently recognized them, the court excluded the evidence.

The plaintiff offered to prove that there was an arrangement between Robert and her husband, by which interest, equal to ten per cent. on $9,100, on a debt due from the latter to his father, was to be treated as dividends upon this stock. But the court excluded the evidence as immaterial.

The court instructed the jury that the plaintiff having knowledge of the fact that Robert B. Moores, upon whom she relied to have the stock transferred to her, was acting for himself as well as in his capacity of cashier, in reference to the matter of issuing this certificate, she was not an innocent holder of the stock, and as the certificate was issued without authority, in fraud of the rights of the bank, they should return a verdict for the defendant. A verdict was returned accordingly, and judgment rendered thereon, and the plaintiff excepted to the

exclusion of evidence and to this instruction, and sued out this writ of error.

*Mr. John W. Warrington* and *Mr. E. W. Kittredge* for plaintiff in error.—I. The issuing of such a certificate of stock, signed by the president and the cashier of the defendant, and under its corporate seal, is the corporate act of the defendant, and not the act of the president and cashier, as mere agents of the corporation. Such certificate is, to all intents and purposes, the certificate of defendant corporation in its corporate capacity. *Wilson* v. *Salamanca*, 99 U. S. 499 ; *Pollard* v. *Vinton*, 105 U. S. 7 ; *Scotland County* v. *Thomas*, 94 U. S. 682.—II. The by-laws of defendant required a certificate for stock owned by its cashier or president to be in the same form, and issued and transferred in the same manner as certificates of stock owned by any other stockholder of defendant. The fact, therefore, that the plaintiff's certificate was understood by her at the time to be issued upon a surrender or transfer of stock owned by Robert B. Moores, the defendant's cashier, was not notice of any irregularity in the issuing of said certificate, or want of validity thereof, to the plaintiff. *Titus* v. *Great Western Turnpike*, 61 N. Y. 237; *S. C.* 5 Lansing, 250 ; *Western Maryland Railroad* v. *Franklin Bank*, 60 Md. 36 ; *American and English Corporation Cases*, Jan. 1884, p. 46 ; *Willis* v. *Fry et al.* 13 Phila. Penn. 33 ; *Ashton* v. *Atlantic Bank*, 3 Allen, 217.—III. The defendant is estopped to deny, as against a *bona fide* purchaser for value, the validity of such a certificate, if it was not an over-issue ; and if it was an over-issue, the defendant is responsible for the loss sustained by such a *bona fide* purchaser for value. *Bank* v. *Lanier*, 11 Wall. 369 ; *Case* v. *Bank*, 100 U. S. 446 ; *Johnston* v. *Laflin*, 103 U. S. 800 ; *New York & New Haven Railroad Company* v. *Schuyler et al*, 34 N. Y. 30 ; *Bruff* v. *Mali*, 36 N. Y. 200 ; *Holbrook* v. *New Jersey Zinc Company*, 57 N. Y. 616 ; *Titus* v. *Great Western Turnpike*, 61 N. Y. 237 ; *Tome* v. *Parkersbury Railroad*, 39 Md. 36 ; *Western Maryland Railroad* v. *Franklin Bank*, 60 Md. 36 ; *Machinists' National Bank* v. *Field*, 126 Mass. 345 ; *Bank of Kentucky* v. *Schuylkill Bank*, 1 Parsons Sel. Cases,

180; *In re Bahia & San Francisco Railroad Company*, L. R. 3 Q. B. 584.—IV. It was negligence for the president of the defendant to sign certificates in blank, and leave them with its cashier. And the rule of law applies that where one of two innocent persons must suffer by the fraud of a third party, he who has, by his trust and negligence, enabled such third party to commit the fraud must answer for the loss. *Merchants' Bank* v. *State Bank*, 10 Wall. 604 (citing on page 646, with approval, *New York, &c., Railroad Company* v. *Schuyler*, 34 N. Y. 30); *Pompton* v. *Cooper Union*, 101 U. S. 196; *Dair* v. *United States*, 16 Wall. 1.—V. If, at the date of said certificate, Robert B. Moores was the owner of any stock in the defendant corporation, the plaintiff became entitled to it, to the extent of ninety-one shares, whether it was then surrendered and cancelled or not; and it was error for the court to exclude Exhibit K, and to assume, and to charge the jury, upon the evidence adduced, that Robert B. Moores was not the owner of such stock and that defendant was entitled to a verdict. *Moores* v. *National Bank*, 104 U. S. 625; *Bridgeport Bank* v. *New York & New Haven Railroad*, 30 Conn. 231.

*Mr. William M. Ramsey* and *Mr. E. M. Johnson* for defendant in error.

Mr. Justice Gray delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

The petition alleges that the false and fraudulent representations made by Robert B. Moores, and relied on by the plaintiff, that he had assigned and transferred the stock in question to her on the books of the bank, were made by him both as cashier and as stockholder; that the bank afterwards fraudulently permitted and procured him to transfer all the stock owned by him, or standing in his name, to its president, for its benefit; that the bank, through its cashier, fraudulently concealed from her the facts that no transfer had been made to her on its books at the time of the issue and delivery of the certificate to her, that the certificate was not authorized or recognized as valid

by the bank, and that the stock standing in his name had been transferred on its books to its president; and concludes by alleging that by reason of such fraudulent conduct and acts of the bank the certificate was invalid and worthless in her hands. But the evidence offered at the trial does not support the allegations of fraudulent conduct on the part of the bank.

The petition alleges "that the plaintiff relied upon the representations of said Robert B. Moores, as cashier and officer of the defendant, that the said certificate was duly issued, and that the stock had been duly transferred by said Robert B. Moores to the plaintiff on the books of said bank; and said plaintiff relied upon said certificate of stock which she received as genuine and valid for what it purported to be." And at the trial the plaintiff relied upon the representations made to her by Robert B. Moores orally and in the letter enclosing the certificate and in his contract of guaranty, as well as upon those arising out of the certificate itself. The two may be conveniently considered separately.

His representations outside of the certificate may be first disposed of. The plaintiff dealt with Robert B. Moores, and not with the bank. Her agreement was with him personally, and she lent her money to him for his private use. His representations to her that he owned stock in the bank, and that such stock had been transferred to her, were representations made by him personally, and not as cashier; and there is no evidence that the plaintiff understood, or had any reason to understand, that those representations were made by him in behalf of the bank. The duty of transferring his stock to the plaintiff before taking out a new certificate in her name was a duty that he, and not the bank, owed to the plaintiff. The making of such a transfer was an act to be done by him in his own behalf as between him and the plaintiff, and in the plaintiff's behalf as between her and the bank. There is nothing, therefore, in his extrinsic representations, for which the bank is responsible.

The certificate which he delivered to the plaintiff was not in his name, but in hers, stating that she was entitled to so much stock, and showed, upon its face, that no certificate could be lawfully issued without the surrender of a former certificate

and a transfer thereof upon the books of the bank. The by-laws, passed under the authority expressly conferred by the act of Congress under which the bank was organized, contained a corresponding provision, designed for the security of the bank as well as of persons taking legal transfers of stock without notice of any prior equitable title therein. *Union Bank* v. *Laird*, 2 Wheat. 390; *Black* v. *Zacharie*, 3 How. 483, 513. The very form of the certificate was such as to put her upon her guard. She was not applying to the bank to take stock, as an original subscriber or otherwise; but she was bargaining with Robert B. Moores for stock which she supposed him to hold as his own. She knew that she had not held or surrendered any certificate, and she never asked to see his certificate or a transfer thereof to her; and he in fact made no surrender to the bank or transfer on its books. She relied on his personal representation, as the party with whom she was dealing, that he had such stock; and she trusted him as her agent to see the proper transfer thereof made on the books of the bank. Having distinct notice that the surrender and transfer of a former certificate were prerequisites to the lawful issue of a new one, and having accepted a certificate that she owned stock, without taking any steps to assure herself that the legal prerequisites to the validity of her certificate, which were to be fulfilled by the former owner and not by the bank, had been complied with, she does not, as against the bank, stand in the position of one who receives a certificate of stock from the proper officers without notice of any facts impairing its validity.

Of the great number of cases referred to in the thorough and elaborate arguments at the bar, we shall notice only some of the most important. None of those cited by the learned counsel for the plaintiff affirm a broader proposition than this: A certificate of stock in a corporation, under the corporate seal, and signed by the officers authorized to issue certificates, estops the corporation to deny its validity, as against one who takes it for value and with no knowledge or notice of any fact tending to show that it has been irregularly issued.

When a corporation, upon the delivery to it of a certificate of stock with a forged power of attorney purporting to be ex-

ecuted by the rightful owner, issues a new certificate to the present holder, who sells it in the market to one who pays value for it, with no knowledge or notice of the forgery, the corporation is doubtless not relieved from its obligation to the original owner, but must still recognize him as a stockholder, because he cannot be deprived of his property without any consent or negligence of his. *Midland Railway* v. *Taylor*, 8 H. L. Cas. 751; *Bank* v. *Lanier*, 11 Wall. 369; *Telegraph Company* v. *Davenport*, 97 U. S. 369; *Pratt* v. *Taunton Copper Company*, 123 Mass. 110; *Pratt* v. *Boston & Albany Railroad*, 126 Mass. 443. And the corporation is obliged, if not to recognize the last purchaser as a stockholder also, at least to respond to him in damages for the value of the stock, because he has taken it for value without notice of any defect, and on the faith of the new certificate issued by the corporation. *In re Bahia & San Francisco Railway*, L. R. 3 Q. B. 584. Whether, before the last sale has taken place, the corporation is liable to the holder of the new certificate, is a question upon which there appears to have been a difference of opinion in England. According to the decision of Lord Northington in *Ashby* v. *Blackwell*, 2 Eden, 299; *S. C.* Ambler, 503; it would seem that the corporation would be liable. According to the decisions of Sir Joseph Jekyll in *Hildyard* v. *South Sea Company*, 2 P. Wms. 76, and of the Court of Appeal in *Simm* v. *Anglo-American Telegraph Company*, 5 Q. B. D. 188, it would seem that it would not, because the holder of the new certificate takes it, not on the faith of that or any other certificate of the corporation, but on the faith of the forged power of attorney. However that may be, it is clear that the corporation is not liable to any one taking with notice of the forgery in the transfer, or of any other fact tending to show that the new certificate has been irregularly issued, unless the corporation has ratified, or received some benefit from, the transaction.

In *Hart* v. *Frontino Mining Company*, L. R. 5 Ex. 111, the plaintiff, a *bona fide* purchaser of the shares, had paid assessments thereon to the company upon the faith of the certificate issued by it to him after his purchase. In *Barwick* v. *English Joint Stock Bank*, L. R. 2 Ex. 259, and in *Mackay* v. *Commer-*

*cial Bank*, L. R. 5 P. C. 394, the bank had derived a benefit· from the fraud of its agent, and was held ·liable upon that ground. The decision in *Swift* v. *Winterbotham*, L. R. 8 Q. B. 244, that a bank was liable upon its official manager's representation to one of its customers that the credit of a certain person was good, was reversed in the Exchequer Chamber. *Swift* v. *Jewsbury*, L. R. 9 Q. B. 301. The decision in the Exchequer Chamber in *The Queen* v. *Shropshire Union Company*, L. R. 8 Q. B. 420, that a railway company, owning shares of its own stock, the legal title of which was registered in the name of one of its directors as trustee for the corporation, should transfer them to a person who, believing the director to be the absolute owner of the shares, had lent him money on the deposit of the certificate as security, was contrary to the judgment of the Court of Queen's Bench, and was reversed in the House of Lords. L. R. 7 H. L. 496.

The American cases on which the plaintiff principally relies are decisions in the courts of Connecticut, New York, Pennsylvania and Maryland, the soundness of some of which we are not prepared to affirm, but all of which are distinguishable from the case at bar.

The leading cases in Connecticut and New York arose out of what have been known as the Schuyler frauds. Robert Schuyler, the president and general transfer agent of the New York and New Haven Railroad Company, issued, beyond the capital limited by its charter, but in the form prescribed by its by-laws, purporting to be transferable on its books on surrender of the certificates, a large amount of certificates of stock, annexed to which were printed forms of assignment and power of attorney. In *Bridgeport Bank* v. *New York & New Haven Railroad*, 30 Conn. 231, a bank which had received, as collateral security · for money lent to a firm of which Schuyler was a member, certificates of stock so issued by him, was held entitled to maintain an action against the corporation for the value of these certificates, upon the single ground that it was admitted that when the plaintiff took these certificates the firm held more than an equal amount of genuine certificates. In *New York & New Haven Railroad* v. *Schuyler*, 34 N. Y. 30, it appeared

that Schuyler had issued, in one and the same form, large numbers of genuine as well as of false certificates, and had raised on both indiscriminately large amounts of money which had been applied for the benefit of the corporation, that all his transactions appeared on its books, and that the directors had for years been guilty of negligence in not making any examination of the books or of the conduct of the transfer office; and none of the purchasers of the false certificates, for the value of which the corporation was held to be liable, had any notice, or means of knowing, that they were not such as Schuyler was authorized to issue.

In *Titus* v. *Great Western Turnpike*, 61 N. Y. 237, the certificates upon which the corporation was held liable stated the stock to be owned by the person who as officer of the corporation issued them, not by the person to whom they were issued, and the latter had no notice of any fraud or irregularity in the issue. In the other New York cases cited for the plaintiff, the certificates had been purchased in good faith, in the market. *Bruff* v. *Mali*, 36 N. Y. 200; *McNeil* v. *Tenth National Bank*, 46 N. Y. 325; *Moore* v. *Metropolitan Bank*, 55 N. Y. 41; *Holbrook* v. *New Jersey Zinc Company*, 57 N. Y. 616. See *Merchants' Bank* v. *Livingston*, 74 N. Y. 223.

In *Kentucky Bank* v. *Schuylkill Bank*, 1 Parsons, 180, the certificates upon which the corporation was held to be liable were in the hands of innocent purchasers without notice. The opinion in *People's Bank* v. *Kurtz*, 99 Penn. St. 344, 349, goes no farther. On the other hand, in *Wright's Appeal*, 99 Penn. St. 425, where the president of a bank, having no authority to borrow money in its behalf, induced his aunt, a stockholder therein, to surrender to him her certificates of shares with blank powers of attorney, by means of false and fraudulent representations that they were needed to aid the bank; gave her his own note therefor, sold the stock, and applied the proceeds to his own use; and afterwards, by a fraudulent combination with the other officers of the bank, issued stock in excess of the lawful limit, and gave her new certificates for those that he had obtained from her; it was held that he was her agent in the original transaction, and that, as she gave no value to the bank

for the new certificates, the loss must fall upon her, and not. upon the bank.

In *Tome* v. *Parkersburg Railroad*, 39 Maryland, 36, there was no by-law requiring a surrender and transfer of old certificates before the issue of new ones, and no limit of the amount of stock to be issued; and it was not contended that there had been any over-issue, or that the plaintiff had any notice of fraud or want of authority in the officers of the corporation. In *Western Maryland Railroad* v. *Franklin Bank*, 60 Maryland, 36, the certificates were not issued to the plaintiff, but bought in the market, without any notice of their having been fraudulently or illegally issued. .

In *Hackensack Water Company* v. *De Kay*, to which the plaintiff has referred us, the Court of Errors of New Jersey said: " Indeed, as is apparent from all the cases cited, the doctrine which validates securities within the apparent powers of the corporation, but improperly and therefore illegally issued, applies only in favor of *bona fide* holders for value. A person, who takes such a security with knowledge that the conditions on which alone the security was authorized were not fulfilled, is not protected, and in his hands the security is invalid, though the imperfection is in some matter relating to the internal affairs of the corporation, which would be unavailable against a *bona fide* holder of the same security." 9 Stew. (N. J.) 548, 565.

The general doctrine was stated with like limitations by this court in the case of *Merchants' Bank* v. *State Bank :* " Where a party deals with a corporation in good faith—the transaction is not *ultra vires*—and he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists." 10 Wall. 604, 644.

This review of the cases shows that there is no precedent for holding that the plaintiff, having dealt with the cashier individually, and lent money to him for his private use, and received from him a certificate in her own name, which stated that shares were transferable only on the books of the bank and on

surrender of former certificates, and no certificate having been surrendered by him or by her, and there being no evidence of the bank having ratified or received any benefit from the transaction, can recover from the bank the value of the certificate delivered to her by its cashier.

The exceptions to the exclusion of evidence cannot be sustained. The evidence that in one or two other instances stock was issued by the cashier without the surrender of old certificates, and that the directors of the bank approved certain transfers to its president of shares once belonging to the cashier, was quite insufficient to prove that the bank ratified or received any benefit from the issue of the certificate to the plaintiff, or was guilty of any fraud towards her. The action of the directors was adapted to the single purpose of securing payment of a debt due from the cashier to the bank.

The evidence introduced and offered being insufficient to support a verdict for the plaintiff, the Circuit Court rightly directed the jury to return a verdict for the defendant. *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478.

*Judgment affirmed.*

Mr. Justice Bradley dissented.

Mr. Justice Matthews, having been of counsel, did not sit in this case, or take any part in its decision.