## THOMSON-HOUSTON ELECTRIC CO. v. CAPITOL ELECTRIC CO.
et al., (READ, Intervener.)

(Circuit Court, D. Tennessee. July 17, 1893.)

No. 2,860.

1. PRINCIPAL AND AGENT — AGENT'S FRAUD AGAINST PRINCIPAL — NOTICE TO
AGENT NOT NOTICE TO PRINCIPAL.

An agent with authority to lend money fraudulently took for his own use
a part of his principal's funds, and forwarded to his principal a note by an
irresponsible maker for the amount, with bonds of a certain corporation
as collateral, representing that he had loaned the amount on the note.
The bonds he had fraudulently put into circulation, acting as agent of the
corporation. *Held*, that the agent acted adversely to his principal, who
therefore was not charged with knowledge of defenses to the bonds.
Allen v. Railroad Co., 22 N. E. Rep. 917, 150 Mass. 206, and De Kay v.
Water Co., 38 N. J. Eq. 158, approved.

2. NEGOTIABLE INSTRUMENTS—TRANSFER WITHOUT INDORSEMENT — EQUITABLE
DEFENSE.

A note payable to an agent as "trustee," but not indorsed by the agent,
is subject to equitable defenses in the hands of the principal, who has
parted with valuable consideration therefor.

3. SAME—EQUITABLE DEFENSES—COLLATERAL SECURITIES.

The fact that a note is held subject to equitable defenses renders bonds
payable to bearer likewise subject to such defenses while in the hands of
the note holder as collateral security for the note.

In Equity. Bill by the Thomson-Houston Electric Company
against the Capitol Electric Company and others to enforce a

sale of respondent's property under a mortgage. Heard on the intervening petition of Mrs. Martha Read, as owner of certain bonds of respondent, for a recovery and participation in the security. Petition dismissed.

Granbery & Marks, for petitioner.

Vertrees & Vertrees, for defendants.

LURTON, Circuit Judge. The original bill was filed for the purpose of enforcing a sale of the plant and property of the Capitol Electric Company, conveyed in mortgage to secure an issue of bonds made by it. Mrs. Read, claiming four bonds of $1,000 each, has intervened by petition, and seeks a recovery and participation in the security. The bonds presented by her are not valid securities, and the defendant company is not liable upon them, unless Mrs. Read can show that she is a bona fide holder for value. These bonds formed part of a series of 50 which the company resolved to donate to its shareholders when all its debts were paid. They were prepared and signed, and left in the custody of the secretary and treasurer, to be distributed upon the payment of all the company's debts. The company is not liable upon them if it is not cut off from defense by the negotiation of the bonds.

1. The bonds are without consideration, being intended as a mere gift to its own shareholders.

2. The debts of the company had not been paid when these bonds were issued by the secretary, in violation of his trust and duty, to himself as a shareholder.

What is the character of her title? She alleges in her petition that she "holds them as collateral security for the payment of a note held and owned by her, purporting to be signed in the name of W. W. Morrow, dated July 1, 1890, payable one year after date, for $3,200, bearing interest from date." She also alleges "that the said note is payable to A. Dahlgren as trustee for petitioner, but she is the real party in interest, and she has owned and held the note from the time of its execution, and is now entitled to demand and receive the amount due thereon." She further avers "that she holds the said four bonds as collateral security for that amount, having acquired the same before maturity, for value, without notice of any defense thereto, either legal or equitable." This note is filed, and is in these words:

"$3,200.00.                                        Nashville, Tenn., July 1, 1890.

"One year after date I promise to pay to the order of A. Dahlgren, trustee, thirty-two hundred dollars, at the First National Bank, for value received, with interest from date.                                        W. W. Morrow."

On the back of this note is contained the following agreement concerning the bonds now involved:

"The within note is secured by the pledge and deposit of the following securities, to wit: Four bonds of the Capitol Electric Company, for $1,000 each, Nos. 81, 82, 83, 84. And the First National Bank, or its assigns, may, after the maturity of this note, sell the same for cash or on time, as it or they may deem best, without notice to other party, and appropriate proceeds to the payment of said note; and, in the event of the above-named securities

being more than the amount of this note, the same shall be held to cover any other of my indebtedness to the bank. I agree to pay an attorney's fee and all other costs of collection.                                W. W. Morrow."

Now, the circumstances under which this note was taken are substantially these: Mrs. Read, who seems to be a woman of wealth, constituted her nephew, Mr. Dahlgren, her agent at Nashville, Tenn., for the purpose of lending her money. This agency, at the time of this transaction, had been continuous for many years, and she had, through him, loaned large sums of money, notes being usually taken payable to her. At the time of this transaction Mr. Dahlgren had some of her means in his hands, and when he rendered her a statement of his account, August 25, 1890, he credited himself with $3,200 as a loan to W. W. Morrow. Along with this statement he sent the Morrow note and four bonds of the defendant company as collateral security. The evidence makes it clear that in point of fact he made no loan to Morrow. What occurred was this: Having money of his principal in his hands, which he wished to use for his own purposes, he procured a stranger of no known means or standing to execute to him the note in question. This was made as a note for his accommodation, and for and in consideration of $25. The collateral contract was made and signed at the same time. Two months afterwards, when accounting to Mrs. Read, he sent to her this note and the four bonds now involved. This note was payable to his order as trustee, and was, with the collaterals attached, delivered to Mrs. Read without indorsement by him. Mrs. Read had no actual knowledge as to these facts, and supposed the transaction to have been what it purported, —a loan on collaterals to W. W. Morrow.

Mr. Dahlgren must be taken in this matter to have purposed a fraud, both against the defendant company, in the improper use of its bonds, and upon his principal, by misleading her by the pretense that he had loaned her means to the maker of this note. He knew the circumstances under which these bonds had been obtained from the company, and that they were not valid obligations. He was her agent, and took the note payable to himself as trustee. The general rule is that the principal is charged with the agent's knowledge affecting the particular transaction. This rule is, however, subject to some limitations. One of these exceptions, as stated by Mr. Pomeroy, is this:

"It is now settled by a series of decisions possessing the highest authority that when an agent or attorney has, in the course of his employment, been guilty of an actual fraud, contrived and carried out for his own benefit, by which he intended to defraud and did defraud his own principal or client, as well as, perhaps, the other party, and the very perpetration of such fraud involved the necessity of his concealing the facts from his own client, then, and under such circumstances, the principal is not charged with constructive notice of facts known by the attorney, and thus fraudulently concealed. In other words, if, in the course of the same transaction in which he is employed, the agent commits an independent fraud for his own benefit, and designedly against his principal, and it is essential to the very existence or possibility of such fraud that he should conceal the real facts from his principal, then the ordinary presumption of a communication from the agent to his principal fails; on the contrary, a presumption arises that no com-

munication was made, and consequently the principal is not affected with constructive notice. The courts have carefully confined the operation of this exception to the condition described, where a presumption necessarily arises that the agent did not disclose the real facts to his principal, because he was committing such an independent fraud that concealment was essential to the perpetration. It has never been extended beyond these circumstances. It follows, therefore, that every fraud of an agent in the course of his employment, and in the very same transaction, does not fall within this exception; and most emphatically it does not apply when the agent's fraud consists merely in his concealment of material facts within his own knowledge from his principal." Pom. Eq. Jur. § 675.

Here Mr. Dahlgren was acting really for himself, and only colorably for his principal. His object was to keep this money. He contrived a scheme by which his principal was to be misled and induced to believe that in the lending of this money and the taking of the security she had had the benefit of the disinterested and independent judgment of her agent as to the safety of the transaction. She was deceived in this, and he intended that she should be deceived. That he intended and expected that in the end she would lose nothing by reason of his misappropriation of the bonds of the company, for whom he was also agent and trustee, does not affect the proposition that he likewise practiced a fraud upon her. It is a case where he intended to defraud each of two principals for his own benefit. In such case I cannot think that Mrs. Read is to be charged with constructive notice that these bonds were invalid. Notice to the agent is not notice to his principal, when the agent acts for himself, in his own interest, and adversely to his principal. The case of Allen v. Railroad Co., 150 Mass. 206, 22 N. E. Rep. 917, is in point. This action was against a corporation for damages for refusing to permit the transfer of stock to plaintiff, and to issue new certificates to her. She had bought the stock through an agent, who was likewise the treasurer of the corporation. He fraudulently filled up a blank certificate he had, and turned it over to her. It was sought to impute to her the knowledge he had as her agent, so as to defeat her action. The court held this could not be done, and gave her a recovery for the value of the stock which she had acquired through her agent, who knew well the spuriousness of the stock, though not disclosed to her. The court then said:

"There is an exception to this rule when the agent is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act. It is sometimes said, that it cannot be presumed that the agent will communicate to his principal acts of fraud which he has committed on his own account in transacting the business of his principal, and that the doctrine of imputed knowledge rests upon a presumption that an agent will communicate to his principal whatever he knows concerning the business he is engaged in transacting as agent. It may be doubted whether the rule and the exception rest upon any such reasons. It has been suggested that the true reason for the exception is that an independent fraud committed by an agent on his own account is beyond the scope of his employment, and therefore knowledge of it, as a matter of law, cannot be imputed to the principal, and the principal cannot be held responsible for it."

De Kay v. Water Co., 38 N. J. Eq. 158, was this: The president of the water company procured the making of a mortgage secur-

ing a bond issue which he knew to be illegal and void. The banks intervened to participate in the proceeds of a sale of the property. It was contended that the knowledge of the president as to the invalidity of the bonds and mortgage was their knowledge. There was a decree in favor of the banks. Said the chancellor:

"I understand the law to be that, where an agent representing two principals concocts a scheme to defraud one of them for the benefit of the other, it will be presumed that he did not disclose to the principal he intended to cheat the means by which he intended to perfect his purpose."

It is not an answer to these cases to say that they are cases where the fraud was perpetrated by the agent of both parties. That is true, but, as I see the facts of this case, the agent here intended to deceive and mislead Mrs. Read on the one hand, and to defraud the defendant company by improperly putting their bonds in circulation on the other. If I could see that his intention to secure Mrs. Read at the expense of his other principal removed the effect of his deception in pretending that he had loaned her money, when he had merely fixed up a contrivance to keep the money for his own use, I should think the case not governed by the cases cited, although it would still fall within the principle that, where an agent acts for himself, he is not, with respect to that transaction, whether his purpose be fraudulent or not, an agent at all, and his principal is not, as to that matter, charged with his knowledge.

Somerville, J., in speaking of the general rule in Frenkel v. Hudson, 82 Ala. 158, 2 South. Rep. 759, says:

"It has no application, however, to a case where the agent acts for himself, in his own interest, and adversely to that of his principal. His adversary character and antagonistic interests take him out of the operation of the general rule, for two reasons: First, that he will very likely in such case act for himself, rather than for his principal; and, secondly, he will not be likely to communicate to the principal a fact which he is interested in concealing. It would be both unjust and unreasonable to impute notice by mere construction under such circumstances, and such is the established rule of law upon this subject."

Citing Terrell v. Bank, 12 Ala. 502; Lucas v. Bank, 2 Stew. (Ala.) 321; Wickersham v. Zinc Co., 18 Kan. 481; Ang. & A. Corp. pars. 308, 309; Story, Ag. par. 140. See, also, Mechem, Ag. §§ 721–723; Moores v. Bank, 111 U. S. 156, 4 Sup. Ct. Rep. 345.

But, if Mrs. Read be relieved of all knowledge imputed to her by reason of Dahlgren's agency, then how stands the case? For the defendant company it is insisted, inasmuch as she holds these bonds as mere collateral to the note, that unless she is, as to the note, a bona fide holder, she cannot be a bona fide holder of the collateral. This note is payable to the order of "Dahlgren, trustee." He transferred it without indorsement to Mrs. Read. Such a transferee does not acquire the legal title. She has at most, on proof of consideration, an equitable title. The note has not, in the sense of the law merchant, been negotiated. Such a holder is not a bona fide holder. The defense of antecedent parties is not by such a delivery cut off. "Such an effect results only from a transfer according to the law merchant; that is, from an in-

dorsement. An assignee stands in the place of his assignor, and takes simply an assignor's rights," "but an indorsement creates a new and collateral contract." Trust Co. v. National Bank, 101 U. S. 70, 71; 1 Daniel, Neg. Inst. § 664 et seq.; Id. § 741; Rand. Com. Paper, §§ 788, 789. That she was the real payee and beneficial owner does not alter the case. She is not the bona fide holder of the Morrow note in the sense of the law merchant. She is the equitable owner of the note, but, like every holder of an equitable title, she must abide by the title of her assignor, and it is in her hands subject to all the defenses which existed at the time she acquired it. Rand. Com. Paper, § 1655.

In view of this state of facts, it is manifest that Mrs. Read has no higher right to enforce this note than Mr. Dahlgren, the payee. She has his title, and no other. Has she any higher or better title to the collaterals which secure the note? Has she acquired, by the delivery of this note and its collaterals, any better title to the collaterals than Dahlgren had? Holding the debt evidenced by the note subject to all equities in favor of any antecedent party, does she not hold the collaterals by just such title as her assignor held them by? It is true the bonds are negotiable. They are payable to bearer, and pass by delivery. If she had loaned this money to Morrow or Dahlgren upon these bonds as security, she would hold them free from any defenses in favor of the defendant company which might have existed as between it and either Morrow or Dahlgren. A straight loan on negotiable bonds which pass by delivery would be a negotiation of the bonds in due course of trade, within the law merchant. Is the same significance and result to follow from what did occur? That these bonds shall turn up in the hands of a bona fide holder is necessary in order that the defenses of the defendant shall be cut off. Mr. Bouvier defines a collateral to be "a separate obligation attached to another contract to guaranty its payment." It is obvious that if the collateral be itself negotiable, and it be attached to a negotiable obligation which is transferred by indorsement, before maturity, for value, and in due course of trade, without notice of defenses, in such case the collateral would pass free from equities. Daniel, Neg. Inst. § 834 et seq.; Carpenter v. Longan, 16 Wall. 275.

The negotiation of the obligation representing the debt to which the collateral was an incident operates as a negotiation of the collateral. The converse of this seems to be equally true. If the contract to which the collateral is attached is nonnegotiable, or is transferred without indorsement, so that the transferee gets only the equitable title of the transferrer, then the collateral is subject to the same defenses. The stream cannot rise higher than its source. If Mrs. Read be only equitably entitled to collect the debt represented by the note, then she has acquired only such title to the collaterals as Morrow or Dahlgren had. If neither could enforce these bonds against the defendant company, then, as her title to them is purely equitable, she can assert no right which they could not. She must, on evidence that she is the real payee

in the Morrow note, be allowed to stand in Dahlgren's shoes. It will not do to say that in the last analysis she has loaned her money upon the faith of these bonds. Dahlgren, having her money, has kept it, and delivered to her a note executed for his accommodation, payable to himself as her trustee, without indorsement, and secured by these bonds as collaterals. She traces her rights to this note, and must stand or fall upon the contract by which these bonds were put up as a guaranty of its payment. Her rights are purely equitable. To cut off the defense to these bonds her rights must be legal. She must show that these bonds have come to her in due course of trade; that they have been negotiated. This she cannot do.

The result is that her petition must be dismissed, with costs.