## SHAW v. GOEBEL BREWING CO., Limited.

(Circuit Court of Appeals, Sixth Circuit.  January 7, 1913.)

No. 2,272.

1 CORPORATIONS (§ 114*)—ASSIGNMENT OF STOCK—SIGNATURE OF TRANSFEREE.
  Where articles of association provide that transfers of shares shall be "signed both by the transferror and transferee," and in "any usual common form of instrument of transfer," *held*, that an omission by the transferee to sign at the time of the transfer may be cured by subsequently signing it.

  [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 466, 470–478; Dec. Dig. § 114.*]

2. CORPORATIONS (§ 130*)—ORGANIZATION—TRANSFER OF STOCK.
  Where complainant accepted an assignment of certain stock in a British corporation organized under the Great Britain Companies' Act 1862–1909, doing business in the United States, he was charged with notice of section 35 of such act, which authorized designated courts, by summary proceedings, to order a change in the company's register of members, in certain cases, without a production of the certificates of stock duly transferred, notwithstanding a representation contained in each certificate that "no transfer of any of the above shares can be registered without the production of this certificate."

  [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 488, 489; Dec. Dig. § 130.*]

3. CORPORATIONS (§ 133*)—TRANSFER OF STOCK—LACHES.
  The owner of certain shares in a British corporation transferred them to B. October 1, 1894, agreeing upon his return to the United States to mail the certificates to B.  Failing to receive the promised certificates, B., in 1904, applied to have the transfer registered, which was denied, whereupon he instituted proceedings authorized by the Great Britain Companies' Act 1862–1909, § 35, in which he was declared owner of the shares and the corporation directed to transfer them, which it did pursuant to the order of the court.  July 7, 1890, the original owner had assigned certain of the same shares to complainant and delivered the certificates to him, but complainant took no steps either to notify the company of his possession of and rights to the certificates or to secure a transfer until 16 years thereafter, and about four years after the corporation had transferred the shares to B. in accordance with the order of the court, and three years after B. had disposed of the shares and ceased to be a member of the company.  *Held*, that complainant must be deemed to have consented to the proceeding resulting in the court order compelling the company to rectify its register, and also to have been guilty of laches, and so to be barred upon either hypothesis from maintaining a suit to require the corporation to transfer the shares.

  [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 513–520; Dec. Dig. § 133.*]

Appeal from the Circuit Court of the United States for the Eastern District of Michigan; Arthur C. Denison, Judge.

Suit by David R. Shaw against the Goebel Brewing Company, Limited.  Judgment for defendant, and complainant appeals.  Affirmed.

This was a suit in equity to establish ownership in appellant of 60 shares of the capital stock of the appellee company; to compel the company "to reissue said stock" to appellant and to pay him all dividends that have accrued or may accrue thereon; and meanwhile to enjoin payment of accruing dividends.  The appellee is a corporation created under the Companies' Act of Great Britain.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The company has two sets of officers and directors, who are designated as "general" and "local." The general officers and directors reside in London, England, and the local in Detroit, Mich. The Register for Members (stockholders) of the company is kept in London, and the issue and transfers of stock of the company are made and entered there. The company's brewery and equipment are located in Detroit and its brewing business is conducted there. It has complied with the statute of Michigan permitting foreign corporations to conduct business in the state, and is admittedly there amenable to process and suit. Its capital stock is divided into preference and ordinary shares, and the par value of both classes is 10 pounds each. The stock in dispute consists only of ordinary shares, represented by three certificates bearing date June 12, 1891 and numbered respectively 402, 403, and 404, each in due form and under seal, in the name of John Peter Grant of Detroit, and certifying that he is the proprietor of ordinary shares numbered (in 402) 4,961 to 4,980 inclusive, (in 403) 4,981 to 5,000 inclusive, (in 404) 5,001 to 5,020 inclusive, "subject to the articles of association and the rules and regulations of the company, and that there has been paid in respect of each of such shares the sum of three pounds (and it appears by indorsements on the certificates that further payments were made in June, 1891, until such shares were fully paid). * * * No transfer of any of the above shares can be registered without the production of this certificate."

July 7, 1890 (Shaw testifying, however, that he received the paper in '91 or '92), John Peter Grant signed and sealed the following:

"I, John Peter Grant, * * * in consideration of the sum of fifteen hundred dollars paid by David R. Shaw, of Detroit, Michigan, hereinafter called the transferee, do hereby bargain, sell, assign and transfer to the said transferee one hundred fully paid 10-pound shares numbered 5,021 to 5,040, 5,001 to 5,020, 4,981 to 5,000, 4,961 to 4,980, 4,941 to 4,960 of and in the undertaking called the Goebel Brewing Co., Ltd. To hold unto the said transferee, his executors, administrators, and assigns, subject to the several conditions on which I held the same immediately before the execution hereof; and I, the said transferee, do hereby agree to accept and take the said shares subject to the conditions aforesaid."

The paper was not signed by Shaw; nor was it stamped. While this paper refers to a greater number of shares than the 60 shares described in the three certificates of stock before mentioned, the appellee never received any other certificates; but he has held the three ever since their delivery to him with the instrument of transfer. No dividends were paid on the stock between that time (1891 or 1892) and 1908; but there is testimony tending to show that the stock possessed a market value of £3 and upwards per share "for a good many years" prior to 1908. In that year demand was made both upon the local secretary and the London secretary for transfer of the stock to the name of appellant and payment of dividends, but answer was made by the London secretary that, while in Europe some 14 or 15 years before, Grant had executed a transfer of all his shares in the company to a Mr. Byrne and had promised to remit the certificates immediately upon his arrival in New York; that he had failed to do so and Byrne had never been able to trace him; that in 1904 Byrne made application to the board in London to register his transfer, which was declined without an order of court; that such an order was obtained December 9, 1904, compelling the company to rectify the register by entering Byrne's name as the owner of the shares formerly standing in the name of Grant. The form of assignment of Grant to Byrne differs from that of Grant to appellant Shaw, above set out, only in date, description of shares, and in the fact that the instrument was stamped and was signed and sealed by Byrne, the transferee. The instrument bears date October 1, 1894, and embraces among others the shares included in the assignment to appellant and represented by the three certificates before mentioned. The order of court before referred to was made by the High Court of Justice, Chancery Division, sitting in London, and, omitting the findings, is as follows:

"This court doth order that the Register of Members of the above-named company be rectified by removing therefrom the name of John Peter Grant as the holder of 117 ordinary shares numbered 4,941 to 5,057 and 95 prefer-

ence shares numbered 4,181 to 4,257 inclusive, and by inserting in lieu thereof the name of said Edmund Byrne as the holder of the shares aforesaid pursuant to a transfer thereof by the said John Peter Grant to the said Edmund Byrne, dated the 1st day of October, 1894. * * * And it is ordered that due notice of the said rectification be given to the registrar of joint-stock companies."

This order was no doubt carried into execution, for the secretary testifies that Byrne ceased to be a member of the company November 13, 1905, having on that date transferred the last of the shares standing in his name.

This suit was commenced in the state court and removed to the court below. Issue was joined by answer, and decree was entered below dismissing the bill.

Corliss, Leete & Joslyn, of Detroit, Mich. (John B. Corliss, of Detroit, Mich., of counsel), for appellant.

Orla B. Taylor and Chas. F. Delbridge, both of Detroit, Mich., for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SESSIONS, District Judge.

WARRINGTON, Circuit Judge (after stating the facts as above). The important question is whether Shaw can compel the Brewing Company to accept a surrender of his certificates and execute and deliver new ones in his name. He obtained his certificates some 16 years before notifying the company of his purchase or demanding a transfer; and this was about 4 years after the company had, in obedience to an order of court, entered upon its register a transfer of these shares to Byrne, and 3 years after Byrne had disposed of the shares and ceased to be a member of the company. It is true that each of Shaw's certificates contains the statement: "No transfer of any of the above shares can be registered without the production of this certificate." It is also true that each of these instruments certifies that Grant is the "proprietor" of the shares named, "subject to the articles of association and the rules and regulations of the company." The twenty-ninth paragraph of the articles of association provides that transfers of shares shall be "signed both by the transferror and the transferee"; but transfers were permissible in "any usual common form of instrument of transfer," and we think, if Shaw's omission in the present instance to sign as transferee were the only difficulty, he could solve it simply by signing the transfer. In re Tahiti Cotton Company, 17 Eq. Cas. 273.

[1] Section 35 of the Companies' Act 1862–1909, Great Britain, which among other sections was admitted in evidence as part of the proofs, provides:

"If the name of any person is, without sufficient cause, entered in or omitted from the register of members of any company under this act, or if default is made or unnecessary delay takes place in entering on the register the fact of any person having ceased to be a member of the company, the person or member aggrieved * * * or the company itself, may, as respects companies registered in England * * * by motion in any of Her Majesty's Superior Courts of law or equity, or by application to a judge sitting in chambers, * * * apply for an order of the court that the register may be rectified, and the court may either refuse such application * * * or it may, if satisfied of the justice of the case, make an order for the rectification

of the register. * * * The court may, in any proceeding under this section, decide on any question relating to the title of any person who is a party to such proceeding to have his name entered in or omitted from the register, whether such question arises between two or more members or alleged members, or between any members or alleged members and the company, and generally the court may in any such proceeding decide any question that it may be necessary or expedient to decide for the rectification of the register."

The Companies' Act provides for the organization of companies such as this, and it is not disputed that this company was so organized; nor is the settled principle disputed (indeed, it is in effect relied on in support of one portion of the argument for appellant) that the applicable provisions of the act must be regarded as entering into and forming part of the company's charter. If it be assumed for the moment that the principle can be safely applied in a case like this, Shaw's rights as stated in his certificates of stock must be considered in connection with section 35 of the Companies' Act. Stated differently, Shaw's right to rely upon the representation contained in the certificates of stock that transfers of the shares could not be registered without production of the certificates was at least in terms qualified by the power vested in the courts of England by summary proceeding, upon motion of any "person or member aggrieved * * * or the company itself," to order the register of members to be rectified wherever a name was without sufficient cause omitted therefrom or when unnecessary delay took place in entering on the register "the fact of any person having ceased to be a member." Since Grant and Shaw were consciously dealing with shares of stock in an English corporation, which involved certificates that admittedly could not be replaced by new ones, with a transfer on the register of members, except in London, it is plain enough that Shaw's right to the relief prayed is to be tested in large measure by such laws of England as were designed to form part of appellee's charter. Johnson v. Charles D. Norton Co., 159 Fed. 361, 363, 86 C. C. A. 361 (C. C. A. 6th Cir.); Bond v. John V. Farwell Co., 172 Fed. 58, 64, 96 C. C. A. 546 (C. C. A. 6th Cir.). The rule in this behalf is the same as it would be if the appellee company had been created by the law of one of our own states, say other than the state of Michigan where Shaw at the time of the transfer resided and still resides. Bank of Augusta v. Earle, 13 Pet. at page 591, 10 L. Ed. 274. The question in that case was "whether, by the comity of nations, and between these states (Georgia and Alabama), the corporations of one state are permitted to make contracts in another" (13 Pet. 588, 10 L. Ed. 274); and immediately following the statement of the question the Chief Justice said:

"It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another, where the rights of individuals are concerned."

Justice Peckham said of that case in Iglehart v. Iglehart, 204 U. S. 487, 27 Sup. Ct. 332, 51 L. Ed. 575:

"Ever since the case of Bank of Augusta v. Earle, * * * this doctrine of comity between states in relation to corporations has been steadily maintained, and it has been recognized by this court in many instances."

And Justice Story said in Black v. Zacharie & Co., 3 How. 483, 511 (11 L. Ed. 690):

"From the nature of the stock of a corporation, which is created by and under the authority of a state, it is necessarily, like every other attribute of the corporation, to be governed by the local law of that state, and not by the local law of any foreign state."

It has been held, as in Guilford v. Western Union Telegraph Co., 59 Minn. 332, 343, 61 N. W. 324, 326 (50 Am. St. Rep. 407), relied on by appellant, that a general law of one state prescribing simply a remedy will not be regarded as binding in another state. The question in that case was whether a resident of Minnesota was entitled to a decree to compel a New York corporation, conducting only its telegraph business in the former state, to issue new certificates of stock in lieu of certificates proved to have been lost 12 years before. The company offered to deliver the new certificates upon receiving a bond of indemnity, claiming that one of its rules required such indemnity. Failing to prove the existence of such a rule, reliance was placed upon a general law of the state of New York which provided a method of obtaining a new stock certificate in case of loss of the original. It was claimed that this furnished the exclusive remedy; but it was held that this was "merely one of the general laws and regulations of the state of New York affecting the remedy, which govern only within the limits of the state enacting them." True, that statute authorized a summary proceeding to be taken in the Supreme Court and an order to be made requiring the corporation to deliver new certificates upon depositing such security or filing a bond in such form and with such sureties as the court might require. 5 Rev. Stat. of N. Y. (8th Ed.) p. 4103. But no such proceeding had been taken or order made. Manifestly that situation was quite different from this one. Here we have a court order actually made and executed, and new certificates issued in obedience to it, which (so far as appears) passed into the hands of third persons without notice of any right in Shaw.

We are constrained to believe that section 35 must be regarded as an integral part of the appellee company's charter, and that Shaw was chargeable with knowledge of the limitation which that section in effect imposed upon his rights under the certificates of stock. Copin v. Adamson, L. R. 9 Ex. 345; Bank of Australasia v. Harding, 9 C. B. 686; Bank of Australasia v. Nias, 16 A. & E. 733, 734. The Companies' Act prescribes the mode in which such corporations as this shall be created. The act states the powers and limitations in detail. It will not do to include some portions, as learned counsel for appellant do, and attempt to exclude others. The portions that are distinctly applicable, like section 35, should be interpreted rather than ignored. In determining the true construction of the section, we should be governed by the decisions of the courts of Great Britain. Elmendorf v. Taylor, 10 Wheat. 158, 6 L. Ed. 289, opinion by Chief Justice Marshall. It should perhaps be stated by way of precaution that it is not meant to say that laws of a foreign nation will be so recognized and enforced, which are repugnant to the local laws or policy.

In the well-considered case of Ex parte Shaw, 2 Q. B. D. 463, 479, it was held to be a matter of discretion whether the court should exercise the summary jurisdiction given by section 35. Although it is apparent in that case that there was a conflict in the earlier decisions, the ultimate conclusion reached in the Court of Appeal and concurred in by his associates is found in what Lord Coleridge said:

"Looking at all the words of section 35, and giving them a reasonable construction, I think that the Legislature intended to give the court jurisdiction to make an order so as to decide questions of title, trusting to the discretion of the court not to decide in this summary manner any intricate or difficult question of title; but that, if the court think fit, they have jurisdiction to make the order in all cases."

See report, also, of same case as affirmed in the Court of Appeal, 46 Law Jour. 394; also, Re Kimberley North Block Diamond Co., 59 Law Times, 579; Lindley on Companies (5th Ed.) 122; 3 Enc'l of Laws of England, 306.

[2] The order of rectification set out in the statement, under which Byrne's name in lieu of Grant's was placed on the register of members, was made upon the motion of Byrne, the hearing of counsel for the Brewing Company, and certain evidence offered in the form of affidavits and exhibits, including the transfer of shares by Grant to Byrne. Grant was not a party to the proceeding. It was made to appear, however, that, upon delivery in London of the instrument transferring his shares to Byrne, Grant promised the latter that upon returning to New York he would forward the certificates to Byrne. Ten years had elapsed since the date of that instrument of transfer, and the evidence tended to show that in spite of diligent search Grant could not be found. Why then did not the court obtain jurisdiction to rectify the register? True, Shaw was not a party to the proceeding and was not given notice of it; nothing appears to have been known of either him or his holdings by anyone connected with the proceeding. The articles of association (section 29) provide that "the transferror shall be deemed to remain a holder of the shares until the name of the transferee is entered in the register in respect thereof." Section 22 of the Companies' Act provides that shares "shall be personal estate." The certificates representing the shares in dispute were simply evidence of title, and, despite Shaw's possession of the certificates, the shares themselves were within Great Britain for the purposes of a suit or proceeding to determine title. Jellenik v. Huron Copper Mining Co., 177 U. S. 12, 13, 20 Sup. Ct. 559, 44 L. Ed. 647. Schedule 1, table A, section 8, referred to in section 50 of the Companies' Act, prescribes the form of transfer, and section 16 of such schedule and table provides that:

"The instrument of transfer shall be presented to the company, accompanied with such evidence as the directors may require to prove the title of the transferror, and thereupon the company shall register the transferee as a member."

The court order in practical effect operated as an evidential substitute for these absent certificates. If the Companies' Act had so required and steps had been taken to make Shaw a party to the proceeding by publication, as was required by the statutes under con-

sideration in the Jellenik Case, the decision there rendered would be conclusive of this case. But, imputing knowledge to Shaw of the provisions of the Companies' Act, it is not perceivable why, as respects the complaint that he was not made a party to the proceeding and that there was want of due process, he should not be regarded as having *consented* to the very procedure which resulted in the order to rectify the register.

The most that Shaw can urge or does urge is that the company is bound by its representation that no transfer of the shares could be registered without the production of the certificates. The basis of liability upon such a representation is estoppel. Joslyn v St. Paul Distilling Co., 44 Minn. 183, 185, 46 N. W. 337. Indeed, we are bound to hold that this is the true theory of liability upon the entire certificate. Moores v. Citizens' Nat. Bank of Piqua, 111 U. S. 156, 165, 4 Sup. Ct. 345, 28 L. Ed. 385. But estoppel or any other theory of liability cannot be invoked in the presence of knowledge, either actual or constructive, that the company's representation was so qualified as that a designated court could summarily relieve against it. Indeed, such fact must be read into the representation. The validity of such a qualification is at last founded on consent. We do not know of any policy of this country that would prevent the giving of such consent; nor of any reason why the maxim "Consensus facit legem" should not be applied in such a case as this. Calloway v. People's Bank of Bellefontaine, 54 Ga. 444, 449; Copin v. Adamson, supra, p. 354 (L. R. 9 Ex. 345); Feyerick v. Hubbard, 71 L. J. 1902, K. B. 509, 511; Rousillon v. Rousillon, 14 Chanc. Div. 371. This is not a case of negligence or of deception or fraud on the part of the company. The company did not of its own volition change its register; it refused to do so; it simply yielded obedience to the order of the court. After executing the court's order, the company was obviously bound to deliver certificates for the stock in favor of Byrne. In saying this, it is not meant to pass upon any right of Shaw as against Byrne.

Further, to urge the doctrine of estoppel or any other theory of liability against the company is to overlook the doctrine of laches as respects Shaw. He trusted Grant, while the company refused to trust either Grant (through his last transfer) or Byrne. Shaw's conduct enabled Grant to perpetrate the only fraud that appears to have been committed. Grant's transfer to Shaw described 100 shares, but he delivered certificates for only 60. This was calculated to excite seasonable inquiry both as to a further certificate and Grant's failure to observe the obligation of his transfer; and yet Shaw seems to have been as indifferent in these respects as he was in regard to notifying the company of his holdings. Grant made his transfer to Byrne 10 years before the court was called upon to make its order; another year elapsed between that time and the time Byrne disposed of his stock; and still three years more were allowed to pass before Shaw made his demand for a transfer. If Shaw had simply apprised the company, at any time during the 12 years that passed between the time he obtained the certificates and the date of the court's order, that he was the owner of the shares described in the certificates in dispute, his case would have been entirely different. Westminster Bank

v. Electrical Works, 73 N. H. 465, 480, 62 Atl. 971, 3 L. R. A. (N. S.) 551, 111 Am. St. Rep. 637; Brisbane v. Delaware W. & R. R. Co., 94 N. Y. 204, 208. He did not in all that time even notify any of the local officers at Detroit of his holdings. It is no answer to say that he desisted from giving notice or making earlier demand because the company was not paying dividends, for, as stated, the evidence tends to show that the stock was for years of substantial value. As between him and the company, he was not a member—a stockholder. He was entitled to become one at any time prior to the action of the court rectifying the register of members; but such a right should have in duced diligence, not neglect. We are not unmindful of the title acquired by Shaw to the certificates through their transfer and delivery; but, in view of the limitation imposed by the company's charter upon the representation contained in his certificates, we hold that it was culpable neglect in Shaw to sleep upon his rights so many years, and that, even if the court order and its execution did not alone operate to divest him of the right to compel the company to recognize the certificates as evidence of title to the shares, he is in no position to urge such recognition.

The decree below is affirmed, with costs.