Stone *v.* Hayes.

STONE and others *vs.* HAYES.

Where an agent having a sum of money in his hands belonging to his principal, is authorized to remit it by purchasing a bill of exchange, he should purchase the bill with such money, and not by using his own credit.

In February, 1837, S., a resident of New-York, received a sum of money as the agent of H. who resided in Liverpool, and was authorized to remit it by purchasing and forwarding a bill of exchange. S. thereupon purchased a bill upon his own credit at a premium of 11½ per cent, which he forwarded to H. at 10 per cent, that being the rate at which similar bills were then selling for cash. H. kept the bill until November, 1839, having in the mean time made various unsuccessful efforts to collect it, and was then first informed that it had not been purchased with his money. He immediately wrote to S. notifying him that the bill would not be regarded as payment, and shortly afterwards brought an action against him for money had and received. *Held* that the action was maintainable.

An agent cannot act so as to bind his principal even in matters touching his agency where he has an adverse interest in himself. *Per* WALWORTH, *Chancellor.*

On error from the supreme court. Hayes sued Stone and others in the superior court of the city of New-York for money had and received, and there was a verdict and a judgment for the defendants, which was reversed by the supreme court; and thereupon the defendants brought error to this court. The opinion given in the supreme court may be seen in the report of the case in 7 *Hill*, 128. The facts are there stated, and they are again briefly referred to in the opinion of the chancellor and of Senator Spencer.

*F. B. Cutting & W. Hall,* for the plaintiffs in error, insisted upon the following points : 1. The defendants below were not guilty of any negligence or misconduct, or of any violation of the instructions of their principal, and were not therefore justly chargeable with the loss upon the bill of exchange in question That loss was occasioned by the failure of the drawee, which they could not have anticipated or have guarded against. 2. The remittance of the bill was a valid payment of the debt which the defendant owed the plaintiff.

*S. P. Staples & D. Lord,* for the defendant in error.

The Chancellor. The question in this case is as to who should be the losers of the amount of a bill of exchange drawn by Brooks, Brothers & Co., of New-York, upon W. F. Brooks & Co., of Liverpool, on the 15th of February, 1837, and remitted to R. Hayes, the defendant in error, by Stone, Swan & Co., the plaintiffs in error, under the following circumstances : The plaintiffs in error were merchants residing in New-York, and had in store for Hayes, who resided either at Liverpool or at Banbridge in the north of Ireland, certain goods which were destroyed by fire. These goods were insured in New-York ; and on and previous to the 6th of February, 1837, Stone, Swan & Co. received from the insurers, for Hayes, on account of those goods, about $3000 beyond the amount of their expenses and commissions. For the purpose of remitting this fund to Hayes, they purchased the bill in question, upon credit, and gave their own note there-

for, at sixty days, at eleven and a half per cent. premium ; instead of buying a bill for cash at ten per cent premium, which was the then cash price of such bills in the market. This bill, which was payable in London at sixty days sight, they remitted to Hayes, informing him it was at ten per cent premium, and concealing from him the fact that they had appropriated his funds to their own use and had purchased this bill on credit. Before the bill became due the drawees failed, and Brooks, Brothers & Co. stopped payment shortly afterwards; so that it was never paid. As soon as Hayes learned that the bill had been purchased by Stone, Swan & Co. upon their own credit, and not with his cash funds in their hands, he repudiated the transaction and gave them notice that he should hold them responsible for the loss.

It is fairly inferrible from the testimony of one of the firm of Brooks, Brothers & Co., that at the time this bill was drawn they had not funds in the hands of the drawee to meet it. For he says they sold bills to the amount of seven or eight thousand pounds sterling, which went out by the same packet, including other bills to the amount of £1500, which they had sold to Stone, Swan & Co. on credit about the same time. And that on the 28th of March they made remittances to the drawees in Liverpool to cover their several drafts in the order in which they had been drawn, and which remittances covered a part of the drafts drawn by them on the 18th of February. The witness further stated that he could not say the bill in question was covered by the special remittances thus made. It is at least doubtful whether the drawees would have been put in funds to meet this bill, even if they had not misapplied the remittances of the 28th of March. The bill was therefore not a good one in point of fact at the time it was purchased by Stone, Swan &. Co. But as there is no proof that they knew the drawers had no funds in the hands of the drawees to meet the bill, or that they had any reason to doubt the responsibility of either at the time of such purchase, if they were the agents of Hayes and acted within their authority from him in making this purchase on their own credit, he must of course bear the loss. On the contrary, if he

had not authorized such a purchase, and has not subsequently ratified it with a full knowledge of the facts, it was their loss and not his.

It is insisted by the counsel for the plaintiffs in error, however, that it was the same thing to Hayes whether they purchased this bill with his funds at ten per cent premium, or upon their own credit at eleven and a half; inasmuch as they charged him only the market price of bills when bought for cash. This would indeed be true, if it was perfectly certain that they would have purchased this bill if their own interests had not come in conflict with those of the person for whom they were acting as agents. His interest was that they should purchase for him the best bill they could obtain for the cash funds in his hands. Their interest was to purchase the bill of a drawer who would let them have it upon a credit; although it might not be quite as safe as the bill of a drawer who would insist upon the payment of the cash at the time he sold his bill. And no one can say that if they had not themselves been in want of money, but had determined to buy for cash only, they might not have made further inquiries which would have satisfied them that they could do better for their principal than to buy this bill for him at the ten per cent, which they charged him for it. That they were much in want of money at that time, is apparent from the fact that they were willing to give one and a half per cent for the use of it for sixty days, even if their own notes did not also draw interest during the time they had to run. For no merchant would pay at that rate for the use of money where it was perfectly indifferent to him whether he purchased a bill for cash or on a credit of sixty days. Whether they actually failed before the expiration of the sixty days does not appear. But that "they had been obliged to yield to the pressure of the times," either within the sixty days, or very soon afterwards, is evident from the letter of Hayes in answer to theirs of the 7th of May in that year. For he alludes to the fact which they had probably communicated to him in their letter, that they had not only yielded to such pressure, but had already had time since their failure to arrange their affairs and again resume business.

The fact that the drawers of the bill gave Stone, Swan & Co. the option to take the bill at ten per cent for cash, or at eleven and a half per cent on their credit, did not alter the transaction in the least, as there is nothing to induce a belief that they would have taken a bill of that house at all, if the drawers had refused to sell on credit. The giving that option, therefore, may have prevented the proper inquiries from being made by these agents, whether the drawers were drawing upon funds in England, or were themselves endeavoring to raise the wind by the sale of bills to pay others which they had previously drawn.

The rule of law which is applicable to the state of facts in the present case is briefly but very correctly stated by the late Judge Story, in his valuable treatise on the law of agency, at the commencement of the 210th section. He says it is a rule of general application in regard to the duties of agents, that in matters touching the agency they cannot act so as to bind their principals, where they have an adverse interest in themselves. This rule is founded upon the plain and obvious consideration, that the principal, bargains in the employment, for the exercise of the disinterested skill, diligence and zeal of the agent, for his exclusive benefit. It is a confidence necessarily reposed in the agent that he will act with a sole regard to the interests of his principal, as far as he lawfully may ; and even if impartiality could possibly be presumed on the part of the agent where his own interests were concerned, that is not what the principal bargains for; and in many cases it is the very last thing which would advance his interests. The late Chief Justice Marshall acted upon this principle in the case of *Short* v. *Skipwith*, (1 *Brock. Rep.* 116,) where the defendant had made an investment for the plaintiff by the purchase of a bond for the delivery of certificates, partly upon his own credit, when he had the cash funds of his principal, with directions to invest them in such certificates. It is true the learned chief justice thought the defendant, by his instructions strictly considered, was not authorized to invest in certificates in this indirect way, by the purchase of a bond for their delivery, yet he puts his decision upon the express ground of the purchase upon credit; and the probability

tnat he might have been induced to take this bond, instead of trying to purchase certificates directly, for the sake of the credit he got upon the purchase. The right of the principal to repudiate a transaction where the agent acts without express authority in such a manner that his interests may have conflicted with his duty to his principal, does not depend upon the question whether the principal has in fact been injured thereby. But the general interests of justice require that the principal shall have the right to repudiate the transaction without reference to that question. For it would, in the greater number of cases, be absolutely impossible to ascertain what influence the personal interest of the agent has had upon his acts. It is sufficient to say the act was unauthorized; and has not been ratified by the principal with a knowledge of the facts which would entitle him to repudiate it.

The correspondence undoubtedly shows 'hat the plaintiffs in error were authorized to invest the fund in their hands in a bill on England, and to remit it to Hayes in th ᵗ manner. But that did not authorize them to use his funds for ʾeir own purposes, and to buy a bill upon credit. And he wo₍ ᵑot have had any reason to suppose they had done so, even it ᾽ letter enclosing the bill had not itself been deceptive. Haₜ in that letter, or in their answer to his letter of the first of ₋arch, 1838, stated the fact that they were pressed for money, and therefore had used his funds to meet claims against them, and that they had purchased this bill for him upon their own credit at a premium of one and a half per cent extra on account of such credit, but had only charged him ten per cent, which was the market value of bills for cash, and he had afterwards treated the bill as his own, it might have been claimed by them as a ratification of this unauthorized purchase. But the fact being otherwise, the charge of the judge who tried the cause that the remittance of this bill was a valid payment to Hayes of that amount, was clearly erroneous. The judgment of the superior court upon the verdict, produced by that illegal charge, was therefore properly reversed by the supreme court, and the judgment of the last mentioned court should be affirmed.

BARLOW, LOTT, PORTER and WRIGHT, Senators, delivered written opinions in favor of affirming the judgment cf the supreme court, on the grounds stated in the opinion of the chancellor.

SPENCER, Senator. In common with Mr. Justice Beardsley, I feel no disposition to relax the restraints which the law has most wisely imposed on agents. And I agree with that learned jurist, that " their duty is plain ; if orders are given, obey them ; if the skill and judgment of the agent are to be his guides, let them be exerted and exercised in good faith, and in conformity with the known and approved usage in similar cases."

With these views of the law and of the duty of agents, I will proceed to examine the case. The defendants, Stone, Swan & Co., were in 1835 commission merchants doing business in the city of New-York, to whom, in common with many others, the plaintiffs in the court below had consigned goods for sale. On these goods the plaintiffs in error had effected insurances in their own names, for the benefit of the owners, at several insurance offices. By the great fire of December, 1835, those goods were destroyed. Between the 28th of January and the 6th of February, 1837, the defendants received from insurance offices in the city of New-York the sum of $60,840,41, on policies amounting to $106,500, for goods lost by fire. Hayes had goods in the hands of the defendants, lost at the fire, to the amount of $5697, 65, which, after deducting a commission of five per cent for collecting and expenses, left 53 per cent for the parties insured, making the amount due Hayes $3019,75, which was carried to his credit on the books of the defendants.

This amount of money was in their hands as the agents or factors of the plaintiff, and either by his express instructions or by the usage of trade it became the duty of the agents to remit it at the current rate of exchange to their principal, by a bill of exchange payable in London at the usual time of payment.

No objection is made to the mode of remittance, to the rate of exchange, to the amount remitted, to the time of its payment, or to the credit of the drawers at the time the bill was sent. The

only ground upon which the recovery was sought is that the defendants gave their note at sixty days for the bill, instead of paying the money for it.

On the next "packet day" (15th Feb.) after the receipt of the money from the insurance offices, one of the firm applied to Brooks, Brothers & Co. of New-York to buy a bill, and inquired the terms, and was told that they were selling at 10 per cent cash, and 11½ at sixty days. Stone replied he would see them again, and afterwards sent for the bill. Brooks says they had the option to take the bill for cash or their note on those terms, and that he did not know which they would elect when they took the bill. It was drawn payable to the order of the plaintiff in London, for £617 9s. 3d. at ten per cent premium; and on the same 15th of February was enclosed in a letter and forwarded to the plaintiff. Its receipt was acknowledged by a letter dated 27th of March following, without objection. A day or two after the bill was purchased and forwarded, the defendants sent Brooks, Brothers & Co. their note for it at sixty days, which was paid by the makers at maturity.

It was not alleged upon the argument, nor can it be pretended, but what if the defendants had sent their check instead of their note for the bill, they would have been absolved from all liability. They were not bound to use the same money, whether in gold or bank bills, which they received from the insurance offices. It was sufficient if they remitted according to their instructions or in the usual course of trade, the same amount of money or a bill of exchange of like amount. And whether the bill was paid for at the time it was forwarded, or the next day, or ten or sixty days after, it seems to me ought not to make and cannot make any difference. Hayes was never liable to the drawers for it. If the defendants had failed the next hour and never paid for the bill, the drawers would have been bound to pay it to the plaintiff.

The moment the bill was forwarded by the packet, whose was it? Clearly it belonged to the plaintiff. No one disputes but that it would have been his, if the defendants had sent their check a day or two after, to pay for it. Suppose they had omitted to send either their check or their note at that time, would

such omission have divested the plaintiff of his title to the bill ? or suppose they had failed, and the drawers and acceptors had remained good, could they have stopped the payment of the bill, and thus have compelled the plaintiff to look to them for the payment of the money ? or could Brooks, Brothers & Co. have stopped the acceptance or payment of the bill, and thus have saved themselves from the loss consequent upon such failure, and cast it upon the plaintiff? It seems to me clear that no such thing could have been done. When the bill was forwarded, the defendants had neither done nor omitted to do any thing incompatible with their duty as faithful agents; and so far as the plaintiff's interests were involved, they had discharged their whole duty and the business was closed. They were afterward equally faithful toward Brooks, Brothers & Co., and discharged their indebtedness to them long before any difficulty arose in consequence of the non-payment of the bill. After all this it seems to me that it cannot be justly affirmed that they have money in their hands belonging to Hayes.

The grounds upon which the supreme court place their decision are that the agents violated their orders, and traded on the money of their principal instead of using it for his benefit in the purchase of the bill.

No express orders are shown to have been given. But if they had been given I think they would have been in the terse language of commercial men, who do their business in few words : " As soon as you receive the money due from the insurance offices, you will remit the amount due me in an approved sterling bill." That this would have been the language employed is evident from the letter of the plaintiff of the 23d of Nov. 1839.

Without express orders the law would imply them, and these would have been obeyed by making the remittance in such bill according to the usage of trade. Precisely such a bill was promptly sent. In this it seems to me there was an observance and not a violation of orders and commercial usage.

As I understand the subject it is a well known and very general usage for commission merchants to whom consignments are made to make sales in their own names and on their own

account, and the money is received and deposited to their credit and drawn out by them. And all their business with their customers and patrons is done with this common fund kept and used in their own names. They are not therefore chargeable with improperly mixing trust funds with their own and using them for their own profit. To make separate deposits in the name of each of their consignors, or in the name of the agent *as agent* for each, would be attended with great perplexity and difficulty, and I believe has never been done.

There can be no doubt but that when the $60,840,41 was received from the insurance offices and deposited to the credit of the agents, if it had been lost, it would have been their loss. Such responsibility arises from the method of doing business. But this is in no respect prejudicial to the principals.

Since the argument of the cause, I have taken some pains to inquire of brokers and other commercial men in New-York, in relation to the custom of trade bearing upon the question involved in this case, and have learned that remittances to England are very uniformly made by bills of exchange at sixty days sight, and that these are sold at one rate for cash, and at another on time, varying according to the pressure in the money market and the interest for the credit given ; and that the purchase of a bill on time casts no suspicion upon the transaction and is frequently done. It is evidence that the drawers were strong and able to give credit, instead of requiring cash in hand. And no possible injury was done to the plaintiff by the credit given for the bill. It is well known that nearly all the commerce of the city is done and millions are paid daily by a mere change of credit on the bank books, without the tale of a dollar.

Upon a very careful consideration of this case, I have not been able to find that the defendants are properly chargeable with any violation of orders, any breach of trust, or any neglect of duty ; and it seems to me that to have required them to do more would be a refinement upon law and morals too subtle for the honest transaction of business between business men.

In my opinion, therefore, the judgment of the supreme court, reversing the judgment of the superior court, ought to be reversed.

Stone *v.* Hayes.

HARD, Senator, delivered a written opinion in favor of rever sal upon the same grounds as those mentioned in the opinion of Senator Spencer.

On the question being put, " Shall this judgment be reversed ?" the members of the court voted as follows :

*For reversal : Senators* FOLSOM, HARD and SPENCER—3.

*For affirmance :* THE PRESIDENT, The CHANCELLOR, and *Senators* BARLOW, BEERS, BURNHAM, DENNISTON, DEYO, EMMONS, JOHNSON, LESTER, LOTT, PORTER,, PUTNAM, J. B. SMITH, S. SMITH, TALCOTT, WHEELER and WRIGHT—18.

Judgment affirmed.

*(Remainder of the cases in the Court of Errors in the next volume.)*