[No. 6546.  Decided May 3, 1907.]

LUCILE DREYFUS MINING COMPANY, *Respondent*, v. H. S. WILLARD *et al., Appellants.*[1]

CORPORATIONS—STOCK—ISSUANCE—FRAUD OF OFFICERS—CANCELLATION OF SPURIOUS STOCK. Where stock purchased on the open market was sent by the buyer to the secretary of the corporation for the purpose of cancellation and reissue, but was fraudulently used otherwise by the secretary, who forged and issued spurious stock in lieu thereof, the corporation is bound by such wrongful issue and is not entitled to have the same cancelled.

SAME—PRINCIPAL AND AGENT. A corporation is entitled to the cancellation of spurious stock wrongfully issued by its secretary, where the original stock came into his hands as a broker before he became secretary, under directions from the owner to take it to the company for reissue, but was otherwise disposed of by him, and the

[1]Reported in 89 Pac. 935.

spurious stock was afterwards wrongfully issued after he became secretary; also, where the secretary was authorized to buy stock on the open market and have the same reissued, but instead of doing so he otherwise disposed of the same and fraudulently issued spurious stock in lieu thereof; also, where the secretary individually borrowed money and fraudulently issued spurious stock which he pledged as collateral security therefor; since, as to stock never in the possession of the owners, and as to which the owners dealt with the secretary as their agent, the agent's interest being adverse to that of the company, the company is not bound by the acts of the secretary.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered April 13, 1906, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action to cancel an overissuance of corporate stock.   Modified.

*H. S. Stoolfire* and *Voorhees & Voorhees,* for appellants.
*Will H. Thompson* and *Charles A. Murray,* for respondent.

Root, J.—This action was brought by respondent, a corporation, to cancel a large amount of overissued stock held by numerous persons.   The appellants Willard and Jamison each appeared in said action and interposed a counterclaim for the amount paid for certificates of such overissue held by him; and appellants Finley and Jamison each interposed a like counterclaim for money loaned upon such certificates, deposited as collateral security by one Kressly, secretary of the corporation.   From a judgment and decree adverse to them, each has appealed.

The respondent was incorporated under the laws of this state, with a capital stock of $50,000, divided into a million shares of the par value of five cents per share, and assessable to an amount equal to par.   It was organized for general mining purposes.   The stock certificates were transferable on the books of the company by assignment, each certificate having upon the back thereof a blank form of assignment.   No restrictions or limitations existed as to officers holding and

transferring stock.   The fraudulent overissue of certificates
which occasioned the trouble herein was made by the secre-
tary of the company, one H. J. Kressly.   The following arti-
cles of the by-laws will show what duties were enjoined upon
him as secretary, and indicate the general method of trans-
ferring the stock provided for by the company:

"Article III.   It shall be the duty of the secretary to keep
a record of the meetings of the stockholders and board of
trustees.   He shall keep a book of blank certificates of stock
and fill up and sign all certificates issued; making the proper
entries in the margin of said book of said issuance, and have
the same properly receipted for when delivered; he shall keep
a stock ledger in debit and credit form showing the number
of shares issued to or transferred to any stockholder, and the
dates of such issuance or transfer; he shall prepare and cause
to be published and recorded all reports and statements re-
quired by law of the company; he shall keep a proper set
of books showing the business of the company and make a
statement of the conditions of the company at the annual
meeting and shall discharge such other duties as may be pre-
scribed by the board of trustees."

"Article VI.   No member of the board of trustees shall re-
ceive any compensation for his services as such, nor shall the
company be held liable for any services rendered by them.
Where a trustee performs the duties of secretary, he shall re-
ceive as compensation $15.00 per month."

"Article IX.   The shares of the company may be trans-
ferred by the holder thereof, or by any attorney legally con-
stituted, or by his or her legal representatives.   The transfers
shall be made by endorsing on the back of the certificate of
stock, surrendering the same, and the same shall be noted in
the proper form on the stock ledger of the company.   The
surrendered certificates shall be cancelled by the secretary be-
fore a new one is issued in lieu thereof, and the certificate so
cancelled shall be preserved by the secretary as a voucher.   A
charge by the secretary may be made for the transfer of stock,
not to exceed twenty-five cents for each transfer, when au-
thorized by the board of trustees."

"Article XI.   The books and papers in the office of the sec-
retary and treasurer shall, at all times, during business hours,
be open to the inspection of the board of trustees or any stock-

holder.    The principal office and place of business of the company shall be at Spokane, Washington."

"Article XII.    Certificates of stock shall be of such form and device as the board of trustees may direct, and each of such certificates shall be signed by the president or vice president, and countersigned by the secretary, and express on its face its number, date of issuance, the number of shares for which and the persons to whom issued, and shall not be valid before stamped by the secretary with the seal of the company."

Kressly was elected secretary of the company, and entered upon the discharge of his duties as such officer early in December, 1902, and continued to act as such officer until the 1st of June, 1903, during which period all of the fraudulent certificates were issued.    The facts appertaining to the appellant Willard were about these: At the time of his election as secretary, Kressly was, and had been for several years prior thereto, a stock broker engaged in buying and selling and handling stock of this and other corporations.    After his election he continued his business as such stock broker and maintained his office as secretary of the company in his brokerage office, keeping the books, accounts, certificates of stock, seal, and other property and appurtenances of the office at said place.    Appellant Willard was at all times a resident of the State of Ohio.    Shortly before Kressly's election as secretary of the company, Willard sent him fifty-five thousand shares of the capital stock of this company, which he had purchased in the open market, and directed that Kressly should take them to the secretary of the company, have them cancelled, and new certificates in lieu thereof issued in his—Willard's— name.    Kressly received these certificates of stock, but instead of taking them to the company and having them cancelled and new certificates issued in lieu thereof to Willard, he disposed of them otherwise, and after he became secretary he executed fraudulent certificates in the sum of fifty-five thousand shares, and forwarded those to Willard, who received them under the belief that they were issued in lieu of the

genuine shares of stock which he had theretofore sent to Kressly to have cancelled and transferred. The stock just mentioned will be hereafter referred to as lot 1.

After Kressly had become secretary of the company, Willard sent him, some time in December or the early part of January, certificates representing seventy-two thousand shares of stock, which he had purchased in the open market, and requested that a transfer thereof be made to himself, the former certificates cancelled, and new certificates, in his name, issued in lieu thereof. Kressly, instead of cancelling the stock and issuing in lieu thereof certificates to Willard, used the stock otherwise and forwarded to Willard seventy-two thousand shares of fraudulent stock; that is, certificates issued for stock over and above the amount allowed by the capitalization of the company, all of the capital stock having been theretofore issued. Willard received these certificates, supposing them to have been issued in lieu of the seventy-two thousand which he had sent in for cancellation and transfer. Subsequent to this transaction, Willard authorized Kressly to buy stock of the company in the open market, in various amounts aggregating seventy-eight thousand shares. The certificates thus purchased or pretended to be purchased by Kressly never came into the possession of Willard, but Kressly at different times sent to Willard new certificates of stock in his—Willard's name—which Willard supposed were issued in lieu of stock purchased, cancelled, and transferred by Kressly.

The appellant Jamison bought overissue stock from Kressly, and paid him therefor $7,000. He also loaned him $1,675 and took like stock as collateral. Appellant Finley loaned Kressly $6,302, and received similar spurious certificates of stock as security therefor. The loans to Kressly by both Jamison and Finley were to him in his individual capacity and not as an officer of the company. The purchases of stock made by Jamison and Willard were not made from the company, as it was known that the company had no stock for sale. All of this stock apparently bore the signature of the

president of the company. It is claimed by respondent that said official's signature was in every instance a forgery, and the trial court so found. We think this finding is correct, although perhaps not material. All of the certificates were signed by Kressly as secretary of the company and were executed upon the usual printed or engraved forms used by the company in issuing its genuine certificates of capital stock. They all bore the seal of the company and appeared upon their face fair and regular. These fraudulent certificates were issued from a stock book which the secretary concealed from the other officers of the company, and by means of the forgeries and the erasure of figures he was able to hide his fraudulent actions for several months.

It is the contention of the appellants that the respondent is liable for the actions of Kressly, upon the ground that a principal is ordinarily liable for the acts of his agent done within the apparent scope of his authority. They contend that, inasmuch as the respondent elected and held out to the world Kressly as its secretary and transfer agent, and intrusted him with its books, stock certificates, seal, and with the duty of making transfers of stock, and authorized him to countersign all certificates of stock issued, they, upon receiving certificates fair and regular upon their face and countersigned by him as secretary, were justified in treating them as genuine, and are authorized to hold respondent liable for the acts of its secretary. It is also urged that the president and other trustees of the company were grossly careless and negligent in that they did not properly supervise the business of the company and the transactions of their said secretary; that had they so done, his fraudulent transactions would have been readily discovered and prevented. We think there is some justification for the strictures made upon these officers of the company; but, while the president and trustees may not have exercised that care and supervision which they should have done, we cannot say from the evidence that such dili-

gence on their part would have prevented those things of which appellants complain.

We will now consider the appeal of Willard. The first lot of stock ·which he purchased was sent to Kressly before the latter became secretary. It is, therefore, clear that Kressly's connection with that stock was in the capacity of Willard's agent, and not as agent of respondent. Every certificate of stock recited that it was "transferable only on the books of the corporation by the holder hereof, in person or by attorney, upon surrender of this certificate properly indorsed." Hence Willard employed Kressly as his agent to take that stock and surrender it to the company and upon its cancellation to receive in its lieu certificates in an equal amount. Kressly did not do this. His failure to so do was a breach of his duty as agent for Willard. The corporation is not responsible to Willard therefor.

With the second lot of stock the case is different. Willard had purchased this stock in the open market and was entitled to present it to the company for cancellation and transfer, and to receive in lieu thereof new certificates drawn in his own name. Living in Ohio, he sent the stock to the company for that purpose, or to that particular officer of the company who was charged by its by-laws and practice with the duty of cancelling stock thus turned in and transferring the same by the issuance of new certificates in lieu thereof. The fact that Kressly had been Willard's agent in numerous stock deals and was at the time acting as his agent in various matters appertaining to the purchase of stock would not, in our opinion, make him the agent of Willard in the matter of the transfer of this stock. Willard was entitled to have it transferred by the company. The company, being a corporation, could act only through its officers. Its by-laws imposed this duty upon this particular officer, and when Willard sent the original cer-. tificates to that official for transfer, we think he had a right to depend upon his performing that duty as an official of the company, and when he received in return for the deposited

certificates an equal amount of new certificates, fair and regular upon their face, bearing the corporation seal and attested by the genuine signature of the secretary, that he had a right to believe that such certificates had been properly issued by the corporation in lieu of the ones which he had transmitted to it for cancellation and transfer.

As to the third lot, it does not appear that Willard ever had any of those certificates in his possession. He authorized Kressly as his agent to buy the stock, making up that lot, in the open market. Kressly did so, or pretended to do so. Instead of sending Willard the certificates of stock which he so purchased, or pretended to have purchased, he, in effect, represents that he has bought said certificates of stock and cancelled them and issued the new certificates in lieu thereof. As before stated, every certificate recites that it is transferable only upon the books of the company by the holder in person or by attorney, upon the surrender of the certificate. Willard knew that, upon the purchase of any valid stock standing in the name of any other person, he could get the same transferred to himself only by going in person or by his attorney to the company and there surrendering the original certificates for cancellation. He knew that no new certificate could be lawfully issued to him until he or his attorney had deposited old certificates in an equal amount with the company. He, of course, supposed that Kressly had purchased this amount of stock and had delivered it to the company for cancellation, and had received the new certificates in lieu of those so surrendered. But in this he was deceived by Kressly. Kressly, if he ever bought such an amount of stock for Willard, did not surrender the same to the company and have the same cancelled by the company as a basis for the issuance of new certificates which Willard received. Hence, it will be seen that the infirmity of Willard's stock lies in the fact that it was issued without his having deposited for cancellation any certificates—this being a prerequisite to the valid issue of the new certificates which Willard received. Under these cir-

cumstances Willard cannot be treated as an innocent purchaser. Kressly, in assuming to draft, seal, and issue the new certificates, was guilty of a breach of duty toward the company; but in not depositing with the company for cancellation and transfer the certificates which he had bought, or pretended to have bought, for Willard, he was guilty of a breach of duty as agent of the latter. For this breach of duty Willard and not the company must suffer.

What we have hereinbefore said applies also to the purchase of stock made by Jamison. If he had purchased valid certificates of stock, properly assigned to him, and had taken them to the office of the company and requested that they be cancelled and new certificates issued therefor to him, any neglect or breach of duty in making the cancellation and transfer by Kressly would doubtless have been chargeable against the company. But it does not appear that he ever had the valid certificates in his possession, that he ever saw or had any assignment of such certificates to himself, or that he personally, or by any attorney other than Kressly, ever took said certificates to the company or made any request for their cancellation or transfer. He seems to have purchased, or thought he did, the original certificates from or through Kressly, and relied upon the latter to present the same to the company for cancellation and transfer. The breach of this duty by Kressly was a breach of his duty as agent of Jamison, and the latter cannot hold the respondent liable therefor.

We next come to the consideration of that stock which was pledged by Kressly as collateral security for the loans made to him by Jamison and Finley. It is the contention of these appellants that they had the right to rely upon this stock being genuine, inasmuch as it was fair and regular upon its face and countersigned and issued by the officer authorized so to do, even though the same was made out and issued to and stood in the name of that officer himself. It is a general rule

23—46 WASH.

that a principal is bound by the word or act of his agent
spoken or done within the apparent scope of his authority;
but to this rule there is a well-recognized exception.  It is in
those cases where the statement or act of the agent, although
within the apparent scope of his authority, is made for his
own personal benefit in a transaction between a third party
and himself personally, and from which no benefit flows to the
principal.  Under such circumstances those who knowingly
deal with the agent, not as such but in his personal capacity,
are not justified in relying upon his self-serving representa-
tions and acts, even though they would be within the appar-
ent scope of his authority, if made or done in a transaction
wherein he was not known to be the interested party.  In other
words, where one deals with an agent concerning a matter
affecting his personal interest, he is not justified in relying
upon the agent's statements and actions as being those of
the principal, but must inquire of the principal himself or of
some disinterested agent having power to speak for him.  The
reason of the rule is that the interests of the principal and
agent in such a transaction are not one and the same, but are
capable of being, and usually are, adverse; and under such
circumstances public policy forbids that the temptation to
betray the principal should be encouraged by permitting the
agent's wrongful acts to work a fraud upon the principal.
One dealing with the agent in such a situation without making
further inquiry does so at his peril.

The decision of the trial court seems to have been based
largely upon the case of *Moores v. Citizens' Nat. Bank of
Piqua*, 111 U. S. 156, 4 Sup. Ct. 345, 28 L. Ed. 385.  In
announcing the opinion of the court, among other things,
Mr. Justice Gray said:

"The very form of the certificate was such as to put her
upon her guard.  She was not applying to the bank to take
stock, as an original subscriber or otherwise; but she was bar-
gaining with Robert B. Moores for stock which she supposed
him to hold as his own.  She knew that she had not held or

surrendered any certificate, and she never asked to see his certificate or a transfer thereof to her; and he in fact made no surrender to the bank or transfer on its books. She relied on his personal representation, as the party with whom she was dealing, that he had such stock; and she trusted him as her agent to see the proper transfer thereof made on the books of the bank. Having distinct notice that the surrender and transfer of a former certificate were prerequisites to the lawful issue of a new one, and having accepted a certificate that she owned stock, without taking any steps to assure herself that the legal prerequisites to the validity of her certificate, which were to be fulfilled by the former owner and not by the bank, had been complied with, she does not, as against the bank, stand in the position of one who receives a certificate of stock from the proper officers without notice of any facts impairing its validity.   .   .   .   This review of the cases shows that there is no precedent for holding that the plaintiff, having dealt with the cashier individually, and lent money to him for his private use, and received from him a certificate in her own name, which stated that shares were transferable only on the books of the bank and on surrender of former certificates, and no certificate having been surrendered by him or by her, and there being no evidence of the bank having ratified or received any benefit from the transaction, can recover from the bank the value of the certificate delivered to her by its cashier."

In the case at bar it is not contended that the respondent corporation received any benefit on account of the spurious stock issued by its secretary, or by reason of any of the transactions involved herein. In the case of *Manhattan Life Ins. Co. v. Forty-Second etc. R. Co.*, 139 N. Y. 146, 34 N. E. 776, the court of appeals of New York said:

"Allen, when he negotiated the loan, was not engaged in the transaction of the defendant's business, or in the discharge of any duty imposed upon him by the defendant. The declarations of an agent are only admissible against his principal when made as a part of a transaction undertaken in behalf of the principal, or in the performance of the duties of his agency.   .   .   .   There is a sufficient reason why the plaintiff cannot avail himself of the representations of Allen in regard to the genuineness of this certificate. They were made

in a private and personal transaction, undertaken for his individual benefit, and so understood by the plaintiff. The plaintiff knew that Allen, in the negotiation of the loan, was not acting as the officer or agent of the defendant, or in its behalf, and that his personal interest in the transaction might lead him to betray his principal. It is an old doctrine, from which there has never been any departure, that an agent cannot bind his principal, even in matters touching his agency, where he is known to be acting for himself or to have an adverse interest. *Stone v. Hayes*, 3 Denio 575; *Bentley v. Columbia Ins. Co.*, 17 N. Y. 423; *Claflin v. Farmers and Citizens' Bank*, 25 N. Y. 293; *Wilson v. Metropolitan etc. R. Co.*, 120 N. Y. 145, 24 N. E. 384; *Moores v. Citizens' Nat. Bank*, 111 U. S. 156, 4 Sup. Ct. 345; *Farrington v. South Boston R. Co.*, 150 Mass. 406, 23 N. E. 109."

In the case of *Farrington v. South Boston R. Co.*, 150 Mass. 406, 23 N. E. 109, 15 Am. St. 222, 5 L. R. A. 849, the supreme court of Massachusetts employed this language:

"The plaintiff cannot rely upon any representations of Reed, because he knew that Reed was acting for himself in borrowing the money and in pledging the stock. The seal of the corporation might well be presumed to be under the control of Reed for the purpose of affixing an impress of it upon the stock certificates, because he was one of the persons who were required to sign certificates of stock, and was the person who had the custody of the certificate and transfer books. The genuine signature of the president of the corporation upon the certificate was the only fact on which the plaintiff had a right to rely; but as the president was not attending personally to the issue of this certificate, it was evident to the plaintiff that Reed might possibly be using for one purpose a certificate signed by the president for another. The certificate was filled up in Reed's handwriting, and nothing whatever was exhibited to the plaintiff tending to show that Reed owned any stock, or that any transfer of stock had been made to the plaintiff by Reed, except the new certificate which was issued to the plaintiff after the bargain between him and Reed had been made. We think that it is a safer and more reasonable rule to hold that a person taking in pledge a certificate of stock, newly issued in his name by an officer of a corporation as security for the private debt of the officer, should be required to investigate the title to the stock, if the officer is

one who has the power, either alone or with others, to issue stock certificates, than to hold that such a person can rely upon a certificate so issued to him in the absence of actual notice or knowledge that it has been fraudulently issued."

The United States circuit court of appeals for the seventh circuit, in *Lamson v. Beard*, 94 Fed. 30, spoke as follows:

"The power of such an officer to draw drafts of his bank upon others is not greater than his authority to accept the checks or drafts of others upon his bank; yet in that case it was held that the general authority of the president of the bank to certify checks drawn upon it did not extend to checks drawn by himself, and it was declared not to be necessary for the principal in such a case to show that the agent had acted unfairly or that he himself had sustained an injury, but that the act of the agent is deemed to be unauthorized, and the contracts void. We agree with counsel for the defendant in error that the concern of the courts should not be to make it easy for persons in fiduciary positions to make way with that which is committed to their care, by relaxing this salutary rule, through considerations of the supposed necessities of business and commerce, and that the rule should not be suspended, where the opportunities for breach of trust are largest, merely because they are large. The best public policy requires that bank officers be rigidly held to the ordinary and well-understood rule. There is, we believe, no good reason to the contrary. . . . It being apparent on the face of the drafts here in question that they were drawn upon the funds of the bank, it was impossible for the plaintiffs in error to receive them in discharge of Cassatt's individual obligations to themselves without being put upon inquiry whether the president had in fact the authority which he assumed to exercise; and it was not enough to make inquiry of him, nor permissible to rely upon the implied representation deducible from the execution of the drafts."

In the case of *Walla Walla County v. Oregon R. & Nav. Co.*, 40 Wash. 398, 82 Pac. 716, a road supervisor was employed by the company to work out certain road taxes. Neither he nor any one did the work, but he issued a certificate, in his capacity as road supervisor, to the effect that the work had been done. Upon this certificate the railway

company drew from the county treasury the amount of cash it had theretofore deposited on account of said taxes. The county brought suit to recover this money. In the opinion of this court the following appears:

"It is urged by appellant that it acted in good faith and that the fraud was on the part of respondent's official, the road supervisor, that said official was the only one authorized to issue certificates; and that, when he did so, appellant had a right to rely upon it. Under some circumstances, the argument would be sound. But its weakness here lies in the fact that this road supervisor was not only an officer of the county in this transaction but he was also the agent of appellant. . . . Ordinarily, an innocent party acting in good faith may rely upon the actions of a public official (except in the exercise of certain governmental functions) within the apparent scope of his authority, and may hold the municipality liable for such acts of its official. But here the appellant is not, in contemplation of law, an innocent party. Thompson was its agent. As such, he knew that the work had not been performed when he executed and delivered the certificate. He knew that he was perpetrating a fraud. A knowledge of all this being possessed by appellant's agent, must, as a matter of law, be imputed to it as principal. Where an official or agent performs, in favor of a certain person, an act which he has no right to do, although it comes within the apparent scope of his authority, his action cannot be held to bind his principal in favor of said person who has knowledge of his lack of authority. In this case Thompson, as road supervisor, had no right to issue a certificate until the requisite amount of work was done. Thompson, as appellant's agent, knew this and knew that the work was not performed, and that the certificate was illegally and fraudulently issued. As appellant's agent, it was his duty to impart this information to his principal. In not doing so, he has caused his employer to suffer as those must who are so unfortunate as to employ unfaithful agents. The certificate in itself has no virtue. The consideration for the refunding of the tax was not the possession of a certificate, but the performance of the work. The certificate was intended merely as the evidence of the work having been done. Within the meaning of the statute, the performance of the work constituted the consideration for the withdrawal of the money. Consequently, when appellant, by

means of a fraudulent certificate, secured a refund without having performed the road work, it received something for nothing. It acquired money from the county for which it gave that municipality no equivalent. The money, thus paid it, was the fruit of a fraud perpetrated by a man acting in a dual capacity, agent of appellant and official of respondent."

In the case at bar, appellants received certificates for which they gave the corporation no equivalent. They were defrauded by one acting in the dual capacity of officer of the company and agent for the stock purchaser, in transactions appertaining to his personal interests and from which the company received no benefits.

We think the judgment of the trial court must be affirmed, except as to that portion dealing with the second lot of stock purchased by appellant Willard. The issuance of that particular lot of stock by Kressly was a fraud both upon the company and Willard; but the company having placed Kressly in the position of secretary with general authority to issue certificates of stock with all of the attributes necessary to give his act the appearance of a transaction in behalf of the corporation, and there being nothing calculated to put Willard on his guard or to arouse any suspicion in his mind that with reference to said transaction Kressly was not acting properly as the officer of the company, we think, under the doctrine of *respondeat superior,* or principal and agent, that the respondent must be held liable for the damages occasioned Willard in that matter.

The judgment of the lower court is affirmed, except as to the item just mentioned. The case, in so far as it has to do with that matter, will be remanded to the superior court with directions to enter a judgment in favor of appellant Willard for the amount paid by him for the second lot of stock, together with the assessments paid thereon, and legal interest on the sum total to date of judgment.

HADLEY, C. J., MOUNT, FULLERTON, DUNBAR, and RUDKIN, JJ., concur.

CROW, J., took no part.